

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| United States of America, *ex rel.* Melan Davis and Brad Davis, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| Blackwater Lodge and Training Center, Inc.<br>850 Puddin Ridge Road<br>Moyock, North Carolina 27958 | ) ) ) ) |
| Blackwater Security Consulting, LLC<br>850 Puddin Ridge Road<br>Moyock, North Carolina 27958 | ) ) ) ) |
| Blackwater Armor and Targets, LLC<br>850 Puddin Ridge Road<br>Moyock, North Carolina 27958 | ) ) ) ) |
| Blackwater Airships, LLC<br>850 Puddin Ridge Road<br>Moyock, North Carolina 27958 | ) ) ) ) |
| Blackwater Logistics, LLC<br>850 Puddin Ridge Road<br>Moyock, North Carolina 27958 | ) ) ) ) |
| Blackwater Canine<br>850 Puddin Ridge Road<br>Moyock, North Carolina 27958 | ) ) ) ) |
| Raven Development Group, LLC<br>850 Puddin Ridge Road<br>Moyock, North Carolina 27958 | ) ) ) ) |
| Greystone Limited<br>Total Intelligence Solutions, LLC<br>1650 Tysons Boulevard<br>Suite 800<br>McLean, Virginia 22102 | ) ) ) ) ) ) |
| The Prince Group LLC<br>1650 Tysons Boulevard<br>Suite 800<br>McLean, Virginia 22102 | ) ) ) ) ) |

Case No. 1:08cv1244 TSE/TRJ

~~FILED UNDER SEAL PURSUANT~~
~~TO 31 U.S.C. § 3730(b)(2)~~ Unsealed

**JURY DEMAND** per TSE order of 2/2/10.

EP Investments, LLC )
1650 Tysons Boulevard )
Suite 800 )
McLean, Virginia 22102 )
)
Erik Prince )
1650 Tysons Boulevard )
Suite 800 )
McLean, Virginia 22102 )
)
)
Defendants. )
)

## COMPLAINT

1.      This lawsuit alleges Defendants (hereinafter collectively referred to as

"Blackwater") have been systemically defrauding the United States. Defendants' fraud takes

various forms, including creating false invoices to claim travel funds, creating false personnel

musters and billing for services rendered by persons known to be engaged in unlawful violence.

2.      Relators are both former Blackwater employees with direct and personal

knowledge relating to Blackwater's fraud. They bring this action on behalf of the United States

under the *qui tam* provision of the Federal Civil False Claims Act, 31 U.S.C. §§3729 *et seq.*, as

amended ("The Act").

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§1331 and 31 U.S.C. §3732, which specifically confers jurisdiction on this Court of actions

brought pursuant to 31 U.S.C. §§ 3729 and 3730.

4.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C.

§3732(a), which provides that "[a]ny action under § 3730 may be brought in any judicial district

- 2 -

in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by § 3729 occurred."

5.      As required under the False Claims Act, 31 U.S.C. § 3730(a)(2), Relators gave the United States personal statements setting forth material evidence and information related to this Complaint well in advance of filing this action.   In addition, Relators met with the United States to explain and describe these fraudulent schemes.

6.      The United States was unaware of the Defendants' fraudulent schemes set forth in this Complaint until being alerted by Relators.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(a) in that Defendants are registered to and do business within this judicial district.

8.      This action is filed under seal in compliance with the False Claim Act requirements.

## PARTIES

9.      Relators Melan Davis and Brad Davis (the "Relators") are a married couple currently residing at 36 Dorethy Road, Redding, Connecticut, 06896.  Both were previously employed by Blackwater.  As recently as last month, Blackwater contacted Mr. Davis, asking that he rejoin Blackwater.  Both Relators have direct and personal knowledge relating to Defendants' fraudulent schemes.   *See* Exhibits A (Brad Davis Declaration) and Exhibit B (Melan Davis Declaration).

10.      Defendant Erik Prince, a resident of McLean, Virginia, with business offices at 1650 Tysons Boulevard, McLean, Virginia, 22102, personally and wholly owns holding companies known as The Prince Group and EP Investments LLC.  Mr. Prince, through these holding companies, owns and controls all the various Blackwater entities named as Defendants,

- 3 -

as well as the entities known as Greystone and Total Intelligence.  Reasonable discovery will establish that none of these entities operate with full independence, but rather each is owned and personally controlled by Erik Prince acting through the vehicles of The Prince Group LLC and EP Investments, LLC.

11.    Defendant The Prince Group LLC is a holding company located at 1650 Tysons Boulevard, McLean, Virginia, 22102.

12.    Defendant EP Investments, LLC, is a holding company managed by the Prince Group, LLC.  EP Investments, LLC is located at 1650 Tysons Boulevard, McLean, Virginia, 22102.

13.    Blackwater Lodge and Training Center, Inc., Blackwater Target Systems, Blackwater Security Consulting and Raven Development Group are all located at 850 Puddin Ridge Road, North Carolina, 27958.

14.    Defendant Greystone Ltd. and Total Intelligence Solutions LLP are companies through which Erik Prince conducts his mercenary business.  Greystone Ltd. and Total Intelligence Solutions LLP are located at 1650 Tysons Boulevard, McLean, Virginia, 22102.

15.    Blackwater and its related entities are registered to do business in Delaware, Michigan, Virginia, Louisiana, North Carolina, Georgia, Texas, Connecticut, Florida, Montana, and California.

## BLACKWATER SYSTEMATICALLY DEFRAUDED THE UNITED STATES ON HURRICANE KATRINA CONTRACTS

16.    Blackwater defrauded the United States by submitting false claims to the Federal Emergency Management Agency ("FEMA") and the State of Louisiana.

17.    Blackwater was retained to provide security services during the aftermath of Hurricane Katrina.

18.    Blackwater immediately began to defraud the United States by seeking to be reimbursed for expenses that were not actually incurred.

19.    Blackwater employees (including the so-called "independent contractors" or "ICs") submitted a variety of bogus receipts.  For example, Blackwater employees, when filling up Blackwater vehicles at commercial gas stations, would simply pick up the receipts that were left behind by other customers.  They would then submit these receipts and be paid in cash by Blackwater.

20.    Blackwater management was well aware that this practice was going on, yet nonetheless continued to disburse cash to its employees, and bill the United States for the amounts.

21.    Blackwater management billed the United States for spa trips, gym membership, and extensive quantities of alcoholic beverages consumed by its employees in non-work-related settings.

22.    Blackwater management billed the United States for unnecessary payments made to vendors who agreed to pay kickbacks to Blackwater management.  For example, one vendor received duplicate payments – which Blackwater billed to the United States – because he provided a fancy BBQ pit to Blackwater management.

23.    Blackwater failed to provide the services required by the contract with FEMA and the State of Louisiana.  Blackwater was arming its employees with deadly weapons (shotguns, Glocks, and M-4s) in order to provide security.  As a result, Blackwater was required to monitor closely the weaponry, and keep at all times a registry of the weapons in the hands of its employees. Blackwater utterly failed to monitor these deadly weapons, and instead lost track of countless weapons.

24.     Blackwater repeatedly and routinely falsified records to hide this serious issue from FEMA and other United States agencies.

25.     Blackwater repeatedly and routinely falsified GSA 139 forms, which are the forms that Blackwater was directed to use to record the hours worked by its employees. Blackwater permitted employees to "clock in" for their fellow employees.

26.     Beginning in October 2005, and continuing until at least April 2006, Blackwater submitted invoices to the United States and to the State of Louisiana that contained falsified hours.

27.     Reasonable discovery is likely to establish that the persistent fraud by Blackwater on the Hurricane Katrina contracts that was observed firsthand by Relators during the October 2005 to April 2006 timeframe actually persisted well past April 2006.

## BLACKWATER SYSTEMATICALLY DEFRAUDED THE UNITED STATES BY DEPLOYING UNQUALIFIED PERSONS TO IRAQ

28.     Blackwater knowingly deployed persons in Iraq who were known to engage in unjustified and unnecessary force.

29.     Blackwater operated a private training facility called Blackwater Academy.

30.     Many persons enrolled in Blackwater Academy were subsequently hired by Blackwater to serve on the Department of State contract, International Republican Institute contract, and other contracts funded by the United States.

31.     Blackwater hired persons to serve on these contracts in order to ensure that these persons had the funds necessary to pay their outstanding tuition bills at Blackwater Academy.

32.     As a result of this direct financial benefit to Blackwater Academy, Blackwater would continue to deploy persons to serve as "shooters" on contracts funded by the United States even after such persons had proven themselves wholly incompetent.

- 6 -

33.     Despite pleas from its own management, Blackwater repeatedly refused to terminate shooters who had used excessive and unjustified force against Iraqis because Blackwater wanted to ensure that these persons could pay outstanding Blackwater Academy tuition.

34.     By providing unqualified shooters who used excessive and unjustified force against Iraqis, Blackwater defrauded the United States in two ways:  First, it failed to provide the contractually-required services.  Second, this misconduct caused the United States to expend substantial time and money redressing the various harms caused by these unqualified persons.

35.     These unqualified persons included Beau Phillips and Luke Doak, both of whom killed or injured Iraqis with unjustified and excessive force.

36.     Blackwater management was well aware of the unjustified shootings, but failed to report them to the United States as was required by the terms of the contract.  Blackwater also failed to terminate these persons and instead continued to bill the United States for their services.

37.     Blackwater continues to defraud the United States to date by billing the United States for trainings conducted by Luke Doak.

38.     Reasonable discovery is likely to show that Blackwater is billing for services and trainings provided by other similarly-unqualified personnel.

## BLACKWATER SYSTEMATICALLY DEFRAUDED THE UNITED STATES BY SUBMITTING FALSE INVOICES

39.     Blackwater contracted with the United States Department of State to provide security services in Afghanistan (Task Order No. 4) and Iraq (Task Order No. 6).

40.     Under the terms of the contracts, the Department of State reimbursed Blackwater for expenses incurred in connected with the provision of services if, and only if, Blackwater

- 7 -

incurred actual costs and paid non-related third parties. Blackwater systemically billed the United States for expenses that were not permitted under the contract.

41.     Blackwater's fraud pervades all of Blackwater's invoices submitted to the United States in connection with Task Orders Nos. 4 and 6 of the Department of State contract.

42.     For example, until discovered and halted by Melan Davis, Blackwater billed the United States for prostitution services provided to Blackwater employees by a Phillipino female. Blackwater placed the name of this Phillipino prostitute on the payroll rosters, which were submitted to the United States as part of the Cost Reimbursable expense reports.

43.     Blackwater overbilled the United States for travel expenses in several different ways.

44.     First, Blackwater created phony invoices that misled the United States into believing Blackwater had made payments to an unrelated third party.

45.     Second, Blackwater transported employees on its own wholly-controlled Presidential Airways subsidiary (previously called Blackwater Aviation), but billed the United States as if the travel had occurred on unrelated third party commercial carriers.

46.     Third, Blackwater created phony invoices to obscure the fact that Blackwater had failed to keep any of the necessary contemporaneous documentation on travel. Blackwater and Greystone employees worked around the clock in Jordan for several days in February 2008 creating phony invoices – at rates well in excess of what was actually paid to any third party -- to match personnel musters. In reality, Blackwater lacked the necessary contemporaneous records and was not authorized to bill the United States under the terms of the contract.

47.     Blackwater overbilled the United States for services provided by a man named Sargon Hendrich. Mr. Hendrich provided some services to Blackwater, and invoiced those

- 8 -

services at rates well in excess of fair market value. Blackwater billed the services to the United States. After the funds received from the United States were disbursed to Mr. Hendrich, he would then pay kickbacks to Blackwater.

48.     Blackwater used Greystone, a wholly-controlled offshore company, to obscure the amount of taxable revenues earned by Blackwater. Reasonable discovery will show that Blackwater transferred funds offshore to Greystone, and then reflected those funds as payment for management fees. Reasonable discovery will show that Blackwater was using this mechanism to send its profits offshore beyond the reach of the United States Internal Revenue Service.

## COUNT ONE
## FALSE CLAIMS

49.     Relators allege and incorporate by reference the preceding allegations.

50.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §3729-32, as amended.

51.     Through the acts described above, Defendants knowingly presented and caused to be presented to the United States government and state governments, false and fraudulent claims, records, and statements in order to obtain payment for services not rendered pursuant to the terms of the contracts under which Defendants operated.

52.     Through the acts described above and otherwise, Defendants knowingly made, used, and caused to be made and used false records and statements. Defendants made these false records and statements in order to obtain funds to which Defendants were not entitled from the United States.

- 9 -

53.     Through the acts described above and otherwise, Defendants knowingly made, used, and caused to be made or used material false records and statements to conceal, avoid, and decrease Defendants' obligation to repay money to the United States that Defendant improperly and fraudulently received. Defendants also failed to disclose to the United States material facts that would have resulted in substantial repayments by it to the federal and state governments.

54.     The United States, unaware of the falsity of the records, statements, and claims made or submitted by Defendants paid and continue to pay Defendants for claims that would not be paid if the truth were known.

55.     The United States, unaware of the falsity of the records, statements, and claims made or submitted by Defendants – or of its failure to disclose material facts which would have reduced government obligations – have not recovered funds that would have been recovered otherwise.

56.     By reason of the Defendants' false records, statements, claims, and omissions, the United States has been damaged in the amount of many millions of dollars in funds.

## COUNT TWO
## WRONGFUL TERMINATION OF RELATOR MELAN DAVIS

57.     Relators allege and incorporate by reference the preceding allegations.

58.     Defendants wrongfully terminated Melan and Brad Davis from the Katrina-related contracts in retaliation for Melan Davis' attempts to blow the whistle on the fraud and abuse occurring in New Orleans.

59.     On or about March 25, 2006, Blackwater contractor Greg Krebs told Melan Davis that she would never win a medal for saving the government money, and she needed to back off.

60.     Defendants wrongfully terminated Melan Davis from the corporate offices in retaliation for her attempts to rectify the abuses occurring in the Jordan offices.  Defendants'

- 10 -

own internal investigation recommended that Ms. Davis not be terminated, but Defendants nonetheless terminated Ms. Davis on February 1, 2008, while she was out on leave battling cancer.

## PRAYER FOR RELIEF

WHEREFORE, Relators pray for judgment against Defendants as follows:

A. That Defendants cease and desist from violating 31 U.S.C. §3729 *et seq.;*

B. That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, as well as a civil penalty in the maximum statutory amount against Defendants for each violation of 31 U.S.C. § 3729;

C. That Relators be awarded the maximum amount allowed pursuant to § 3730(d) of the Federal Civil False Claims act;

D. That Relators be awarded all costs and expenses incurred in bringing this action, including attorneys' fees; and

E. That the United States and Relators receive all such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Date:  December 1, 2008

Susan L. Burke (VA Bar No. 27769)
William T.  O'Neil
Counsel for Relators
BURKE O'NEIL LLC
1718 20th Street, N.W.
Washington, DC 20009-1105
Telephone:     (215) 971-5058
Facsimile:     (202) 232-5504
sburke@burkeoneil.com

- 11 -

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

|  |  |
|---|---|
| United States of America, *ex rel.* Melan Davis and Brad Davis, )<br><br>Plaintiffs, )<br><br>v. )<br><br>Blackwater Lodge and Training Center, Inc. )<br>850 Puddin Ridge Road )<br>Moyock, North Carolina 27958 )<br><br>Blackwater Security Consulting, LLC )<br>850 Puddin Ridge Road )<br>Moyock, North Carolina 27958 )<br><br>Blackwater Armor and Targets, LLC )<br>850 Puddin Ridge Road )<br>Moyock, North Carolina 27958 )<br><br>Blackwater Airships, LLC )<br>850 Puddin Ridge Road )<br>Moyock, North Carolina 27958 )<br><br>Blackwater Logistics, LLC )<br>850 Puddin Ridge Road )<br>Moyock, North Carolina 27958 )<br><br>Blackwater Canine )<br>850 Puddin Ridge Road )<br>Moyock, North Carolina 27958 )<br><br>Raven Development Group, LLC )<br>850 Puddin Ridge Road )<br>Moyock, North Carolina 27958 )<br><br>Greystone Limited )<br>Total Intelligence Solutions, LLC )<br>1650 Tysons Boulevard )<br>Suite 800 )<br>McLean, Virginia 22102 )<br><br>The Prince Group LLC )<br>1650 Tysons Boulevard )<br>Suite 800 )<br>McLean, Virginia 22102 ) | Case No.<br><br>**JURY DEMAND**<br>**FILED UNDER SEAL** |

EP Investments, LLC )
1650 Tysons Boulevard )
Suite 800 )
McLean, Virginia 22102 )
)
Erik Prince )
1650 Tysons Boulevard )
Suite 800 )
McLean, Virginia 22102 )
)
)
Defendants. )
)
)

## STATEMENT OF MATERIAL DISCLOSURE SUBMITTED BY BRAD DAVIS

I, Brad R. Davis, hereby declare to the following under penalty of perjury:

1. My name is Brad R. Davis. I am 38 years old. I currently live at 36 Dorethy Road Redding, CT 06896. My telephone number is 203.664.1030.

2. The information set forth below, and the appended documents, have previously been provided on or about April 25, 2008, to the United States Attorney James Candalmo, Eastern District of North Carolina, and his investigators. AUSA Candalmo may be contacted at 310 New Bern Avenue, Suite 800, Terry Sanford Federal Building, Raleigh, NC 27601-1461. His telephone number is (919) 856-4530.

3. I served in the United States Marines from November 1999 to August 2002. I was medically separated from the military as a result of an injury to my hip. I was honorably discharged on or about August 1, 2002.

4. In June 2004, a friend from my days in the Marines, Christian Duggan, called me and suggested that I apply to Blackwater. I submitted a resume, and received a call from a Blackwater employee three days later.

2

5.  In October 2004, Blackwater asked me to come to Moyock, North Carolina, for training in order to qualify to serve on a contract with the State Department. I attended and passed all the training requirements. Blackwater thereafter informed me, however, that the State Department was not willing to clear me to work on the contract because I had incurred significant unpaid debts.

6.  In April 2005, Blackwater called me again and informed me that Blackwater was going to be sending personnel to sites outside Baghdad, Iraq. Blackwater asked if I wanted to go, and suggested I depart that same day.

7.  I asked for a few days before departure, as I had just gotten engaged to Melan Hebert, now my wife. Blackwater agreed. After a few days, I began to travel to Iraq on or about April 25, 2005, and was assigned to work in Ba'Qubah guarding State Department and other American government personnel.

8.  During my tenure (April 27 – August 1, 2005) in Iraq, I observed conduct that established that Blackwater was not providing the State Department with the services required by contract.

9.  When I first arrived in Baghdad at the Team House, I was asked to assist with unloading bags of dog food into the Armory. As I unloaded the bags of dog food, another Blackwater employee opened the bags and pulled out weapons. It seemed as though Blackwater was smuggling weapons into Iraq.

10. I also learned, two years later, that Erik Prince personally smuggled out antique Iraqi fighter planes. He had the planes dismantled, smuggled out in parts, and then reassembled for display. Photographs of these airplanes are attached as Exhibit 1.

3

11. The State Department contract requires Blackwater to provide trained and qualified persons to serve as security guards for State Department personnel. Instead of providing such persons, Blackwater used persons who were not properly vetted and cleared by the State Department. This misconduct deprived the State Department of the value of the contract.

12. I personally observed three incidents in which Blackwater personnel intentionally used excessive and unjustified deadly force, and in some instances used unauthorized weapons, to kill or seriously injure innocent Iraqi civilians.

13. The first incident ("Flat Tire Incident") I personally observed occurred in Ba'Qubah near the street colloquially referred to as "RPG Alley." Our convoy had pulled over to fix a flat tire on one of the vehicles. The other vehicles in the convoy formed a defensive circle around the vehicle with the flat tire. An Iraqi civilian with a single passenger happened to be driving near us in a small black car. The driver was not heading directly towards us. A Blackwater employee named Brad Elmer (known as "Snoop" because he is a dog handler) motioned to the driver, and almost immediately began firing directly into the car, without using the required escalation of force. From my vantage point, it was clear that Elmer was clearly injuring and likely killing the passenger and likely injuring the driver as well.

14. Blackwater failed to stop and see whether either man was alive and in need of urgent medical care. This Flat Tire Incident occurred in June, 2005.

15. Blackwater failed to report the incident to the Iraqi authorities.

4

16. Blackwater failed to report the incident to the State Department as was required by contract.

17. The second incident I personally observed ("First Beau Phillips' Incident") occurred immediately outside Baghdad. I was driving the vehicle with the principal, a State Department official named Sherman Grandy. His photograph is attached as Exhibit 2. I heard shots fired. Through the contemporaneous radio discussion, I learned Beau Phillips, known by his nickname "Elvis," had fired without cause repeatedly at a car using a weapon colloquially referred to as a "SAW." A "SAW" is an M-249 Squad Automatic Weapon. These weapons are not authorized weapons. Any shots are supposed to be fired from either an M4 or a pistol. Phillip's unjustified and excessive force, and use of a prohibited weapon, killed or seriously injured those in the car.

18. Blackwater failed to stop and see anyone in the car was alive and in need of urgent medical care.

19. By the time our convoy had returned to the Green Zone, the State Department had already heard about the incident. Someone other than a Blackwater employee had reported the incident to the State Department.

20. The team leader, Charles Sheppard, met with the State Department. My understanding is that he misled the State Department into believing that the murder was a justified use of force, although clearly it was not. Although I was present, no one ever interviewed me or asked me to memorialize what I had heard and seen.

21. The third incident I personally observed also involved Beau Phillips ("Second Beau Phillips Incident"). In June 2005, we were all in a convoy waiting outside the gate at the Forward Operating Base ("FOB") Warhorse in Ba'Qubah. I was in the vehicle with the principal. Beau Phillips opened fire with the "SAW" on a vehicle near the gate for no reason. Phillip's unjustified and excessive force, and use of a prohibited weapon, killed or seriously injured those in the vicinity.

5

22. Blackwater failed to stop and see whether any of the civilians were alive and in need of urgent medical care.

23. Blackwater failed to report the incident to the Iraqi authorities. Blackwater did not take any action whatsoever to discipline Mr. Phillips. Instead, Blackwater let him continue to serve on the State Department contract.

24. All of these incidents of excessive force were initially videotaped and voice recorded. On each "run" we would mount the video camera on the dash board of the Follow vehicle. Immediately after the day concluded, we would watch the video in a session called a "hot wash." We would discuss what we had done well and what we had done poorly. Immediately after the hot washing, the video was erased to prevent anyone from seeing what Blackwater viewed as "sensitive."

25. The videotaping did not capture any shots fired by the CAT (Counter Assault Team) vehicles, which are the follow on vehicles. However, the voice recordings on the video capture the remarks by the personnel in the CAT vehicles.

26. After the Nissor Square massacre on September 16, 2007, the State Department required that every video be turned in.

27. I departed Iraq in August 2005. I returned to the United States, and married Melan Hebert on September 10, 2005.

28. In September 2005, Blackwater entered into a contract with Homeland Security and the Federal Emergency Management Agency to assist in the disaster-recovery efforts in Louisiana.

29. Blackwater contacted me in early October, and retained me to serve as a team leader for a new site in Texas.

30. After the Texas site was handed over to Wackenhut, I was moved first to New Orleans, and then to Baton Rouge.

6

31. During my one-month tenure in New Orleans, I served first as an assistant area manager. On or about December 18, 2005, I was promoted to the position of area manager in Baton Rogue.

32. Blackwater management physically located in Louisiana included team leaders directly responsible for supervising employees, and area managers responsible for supervising the area sites.

33. I personally observed substantial and ongoing fraud by Blackwater.

34. Blackwater failed to maintain any accountability over the weapons purchased for these contracts. The armory issued shotguns, Glocks and M4s. But when a weapon was lost, Blackwater management failed to record that fact. [1]

35. Blackwater failed to fulfill the contract requirements for training in Louisiana. Blackwater hired persons without completing any screening in advance. At times, it turned out that Blackwater had armed and placed on the streets persons who had been convicted of felonies or were otherwise prohibited by the Lautenberg Act (regarding persons convicted of domestic violence) from carrying weapons. Although Blackwater eventually terminated some or all of those persons, Blackwater had armed them and placed them on public streets of Louisiana for a significant period of time.

36. Blackwater falsified GSA 139s. These are the official time sheets that have to be filled out properly in order to ensure accurate billing to the United States.

---

[1] I also learned from colleagues that the failure to account for weapons was not limited to Louisiana. On one occasion, Blackwater employees working in Moyock sold a M249 (known as a "saw") to a civilian for $10,000. It is illegal to possess such weapons. Not realizing it was illegal, the purchaser brought it back to the armory on a different shift, complaining that there was something wrong and seeking refund or replacement. Although the United States ended up learning about the incident, the United States did not realize that the United States law enforcement personnel tasked to investigate the incident were put on Blackwater's payroll.

7

37. Blackwater management permitted its personnel to forge GSA 139s. For example, a site manager would allow an employee to take a day off, but permit the employees' friend to sign him in. This fraud benefitted Blackwater, because it permitted Blackwater to provide extra benefits and retain employees. Blackwater area manager Jim Seaton was one of the Blackwater managers who forged GSAs.

38. In my area, I personally caught five Blackwater employees engaged in fraud. These employees would show up at the site, sign in and leave a few hours later. Two of those persons were not so-called "independent contractors," but were full-time Blackwater employees from Moyock. There names are John Youngblood, and Heather Brantley.

39. Blackwater managers Greg Krebs and George Clay Richardson engaged in a widescale pattern of fraud that resulted in false billings to the United States and Louisiana.

40. Blackwater project manager James "Seamus" Flatley, located in the Moyock headquarters, supported any decision made by Krebs and Richardson.

41. The extent of fraud in Louisiana was substantial. I personally observed the misconduct described in my wife Melan Davis' Statement of Material Disclosure. As a result of my wife's discovery of billing fraud, Krebs and Richardson retaliated against me and my wife. We were forced to leave the Louisiana contract in April 2006.

42. Thereafter, I subsequently was hired as a C1, which is first line management, on the International Republican Institute ("IRI") contract, which is funded by the State Department. I deployed to Iraq on July 25, 2006.

43. At that time, James Johnson was the in-country manager. Brian Guetig was a site manager. They were the only Blackwater management in place.

44. When I arrived, I discovered that IRI leadership was not satisfied with Blackwater's performance on the contract. The Blackwater team that had been in place on the IRI contract included "Gunny" Cannel and Rod ("K2") Richardson. There had been a

8

substantial amount of weapons smuggling, unjustified shootings, sexual relationships with IRI employees, fight clubs, and other unprofessional conduct.

45. Dave Jackson of Blackwater had hired me and a few others to try to start afresh with the IRI. I supervised 43 Iraqis and 10 Americans. We were a guard force, working with Greystone (a Blackwater subsidiary) to vet and train Iraqis on weapons, vehicle searches, and other activities relating to being a guard force. We also carried out the necessary weapons and vehicle searches to guard the IRI facility.

46. The IRI contract required Blackwater to protect IRI's red zone offices (called Vegas) and green zone offices (called San Francisco). Blackwater consistently obtains the contract with IRI because Erik Prince personally makes a substantial donation to the Republican Party. Yet it is the United States Department of States that funds IRI's efforts.

47. During my second deployment to Iraq, I learned about another instance in which a Blackwater employee used excessive and unjustified force against an Iraqi. A man named Luke Doak (nicknamed "Peanut") shot and killed an Iraqi within days of arriving in country in September 2006. Doak had no reason to kill him. Doak was bragging and gloating about his "kill".

48. This was not the first time that Doak had used excessive and unjustified force. His supervisor, George Angerer, sought to have Doak placed on the "Do Not Use" list. According to the information shared by other Blackwater managers, Doak killed an innocent Iraqi during his tenure on the MAMBA team under a man named Mack's supervision.

49. Blackwater was unwilling to sever Doak from its payroll because he was enrolled and graduated from Blackwater Academy. Blackwater permits persons to go through the Academy at no charge, and then deducts the tuition from their subsequent pay as Blackwater contractors over a two year period. In that way, Blackwater benefitted

9

financially in two ways by keeping Doak on contract: Blackwater received payments from the United States and also received payments directly from Doak.

50. Gloria Shytles told me that Blackwater needed to find Doak a job in order to ensure that he repaid Blackwater the tuition. She was well aware of the fact that Doak had murdered two people with Blackwater weapons while working on a Blackwater contract in Iraq.

51. Doak is now serving as an instructor for Blackwater, teaching firearms and tactics. Much of Blackwater's training is paid for by the United States, State, and Local governments.

52. In addition to the foregoing information, my wife Melan Davis and I have provided extensive documents with additional relevant details to AUSA Candalmo. Our counsel is maintaining a set of these documents available for any additional review desired by the Department of Justice.

Brad R. Davis

Executed on __30_ day of September, 2008.

10

**Exhibit B**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

United States of America, *ex rel.* Melan Davis and )
Brad Davis, )
                                                    )   Case No.
              Plaintiffs,                           )
                                                    )   **FILED UNDER SEAL**
v.                                                  )   **JURY DEMAND**
                                                    )
Blackwater Lodge and Training Center, Inc.          )
850 Puddin Ridge Road                               )
Moyock, North Carolina 27958                        )
                                                    )
Blackwater Security Consulting, LLC                 )
850 Puddin Ridge Road                               )
Moyock, North Carolina 27958                        )
                                                    )
Blackwater Armor and Targets, LLC                   )
850 Puddin Ridge Road                               )
Moyock, North Carolina 27958                        )
                                                    )
Blackwater Airships, LLC                            )
850 Puddin Ridge Road                               )
Moyock, North Carolina 27958                        )
                                                    )
Blackwater Logistics, LLC                           )
850 Puddin Ridge Road                               )
Moyock, North Carolina 27958                        )
                                                    )
Blackwater Canine                                   )
850 Puddin Ridge Road                               )
Moyock, North Carolina 27958                        )
                                                    )
Raven Development Group, LLC                        )
850 Puddin Ridge Road                               )
Moyock, North Carolina 27958                        )
                                                    )
Greystone Limited                                   )
Total Intelligence Solutions, LLC                   )
1650 Tysons Boulevard                               )
Suite 800                                           )
McLean, Virginia 22102                              )
                                                    )
The Prince Group LLC                                )
1650 Tysons Boulevard                               )
Suite 800                                           )
McLean, Virginia 22102                              )

EP Investments, LLC                          )
1650 Tysons Boulevard                        )
Suite 800                                    )
McLean, Virginia 22102                       )
                                             )
Erik Prince                                  )
1650 Tysons Boulevard                        )
Suite 800                                    )
McLean, Virginia 22102                       )
                                             )
                                             )
                  Defendants.                )
                                             )
                                             )

## STATEMENT OF MATERIAL DISCLOSURE BY MELAN DAVIS

I, Melan Hebert Davis, hereby declare to the following under penalty of perjury:

1.   My name is Melan Hebert Davis.  I am 40 years old.

2.   The information set forth below, and the appended documents, have previously been

     provided on or about April 25, 2008, to the United States Attorney James Candalmo,

     Eastern District of North Carolina, and his investigators.  AUSA Candalmo may be

     contacted at 310 New Bern Avenue, Suite 800, Terry Sanford Federal Building,

     Raleigh, NC 27601-1461.  His telephone number is (919) 856-4530.

3.   My husband Brad Davis worked for Blackwater.  During his assignment to New Orleans

     to serve on the Katrina disaster-recovery efforts, he learned that Blackwater project

     manager James Flatley needed assistance on record-keeping and billing responsibilities.

     Mr. Flatley met and interviewed me in December 2005, and then hired me during the

     interview.

4.   After receiving the job offer from Blackwater, I moved to Geismar, Louisiana. I viewed

     the relocation as permanent.

5. When I arrived and began work on January 18, 2006, I discovered that Blackwater had been failing to engage in even the most rudimentary form of record-keeping relating to its existing contracts with Homeland Security and the Federal Emergency Management Agency.

6. I discovered that Blackwater distributed substantial sums of cash to the employees. I began to review receipts that had been submitted to account for this cash, and discovered that much of the cash had been expended on non-permissible items, such as bar tabs, spa trips, protein shakes, weight-training supplements, haircuts and gym memberships. Many of the cash disbursements lacked any receipt or other contemporaneous documentation. Employees who received this money from Blackwater included, but are not limited to, George Kelly, Greg Krebs, Clay Richardson, and James Witherington (a former Jennings, Louisiana police officer). This was a widespread practice occurring at every site.

7. From reviewing physical receipts, I also discovered that the Blackwater employees, when filling up the vehicles with gasoline, would simply pick up any receipts left behind by other customers. They would submit both the actual and phony receipt for the gasoline purchase.

8. I also discovered that Blackwater was making unnecessary or inflated payments to vendors. I discovered an invoice that had been submitted by Todd Knight, Blackwater's fleet manager, for hydrogen and nitrogen purchased from Louisiana's nuclear plant. Upon further inquiry, I learned that Blackwater had been purchasing this material, and then Todd Knight would provide it to the welding company operating near the Blackwater fleet location. In turn, the welding company provided Todd Knight a beautiful BBQ pit for his backyard that was used for Blackwater parties.

9. Another example occurred in February 2006. Blackwater employee Andy Veal rushed into my cubicle and said that I needed to get him $1000 in the next hour in order to obtain fingerprints of anyone carrying a weapon. I knew that we already had the fingerprints we needed in hand because everyone was fingerprinted when they were in processed in

Louisiana. When I questioned Veal, he called Flatley in Moyock, who ordered me to give $1000 cash to Veal. I gave it to him, but said he had to provide me a roster of the persons fingerprinted. He never provided it. I believe the fingerprinting was never done.

10. I also believe Andy Veal was obtaining double reimbursement for many of the expenses incurred in the area. Veal would submit paper receipts to me, and receive cash in exchange. I later learned he was simultaneously submitting credit card receipts to Jessica Potter for the same items to Moyock, and receiving a second reimbursement.   Rene Barger, a Blackwater employee, billed these fraudulent payments to the federal contracts.

11. From reviewing vendor invoices for janitorial and other services, I discovered that Blackwater management (Todd Knight, Clay Richardson, Greg Krebs) in Louisiana would submit vendor invoices for payment from the Louisiana funds while simultaneously having the vendors themselves submit the bills for payment to Blackwater headquarters in Moyock. Blackwater paid twice on these vendor invoices, with the proceeds being split between Blackwater managers and the vendors in collusion with them. Rene Barger, a Blackwater employee, billed these fraudulent payments to the federal contracts.

12. With further inquiry, I learned that Clay Richardson and Greg Krebs had been in collusion with a vendor. They would pay him for cleaning services. He did not actually operate a cleaning service. In exchange for the payments, rather than providing cleaning services, he would provide strippers. I fired this vendor. Rene Barger, a Blackwater employee, billed these fraudulent payments to the federal contracts.

13. I alerted Blackwater managers Clay Richardson and Greg Krebs to all of these fraudulent practices and to my steps to control and eliminate them. They were both participants in the fraudulent activity, and were angered by my efforts to eliminate these practices.

14. Shortly after I alerted Krebs and Richardson to what I knew, in the end of February or very early March 2006 (likely March 1), I discovered that someone had taken $986 from the safe. I had previously requested that the combination to the safe be changed to give

me complete control over the cash, but that request had been denied by Krebs. As a result, more than five Blackwater employees had full access to the cash kept in the safe.

15. When I opened the safe on or about March 1, 2006, I pulled out the cash that I had obtained from the last visit to the bank. The bank had provided us cash in marked bundles. When I took them out, the tapes wrapped around the bundles seemed loose, which made me concerned. I immediately alerted Lenny Stokes to my concerns, and counted the cash in front of him. I then asked him to recount the cash. His wife Jo Stokes was watching us, as she had accompanied him to the office that day. After Lenny Stokes confirmed my count, I immediately alerted Krebs that the safe had been accessed by someone with the combination and $986 taken without authorization. The cash was not taken from a single bundle, but rather a few bills were pulled from each bundle to make it less obvious. Clearly, someone had taken the cash, and tried to obscure doing so, in order to cause me to disturb my monetary controls and accuracy.

16. Rather than properly investigating the matter, Krebs and Richardson blamed the theft on me. Richardson accused me of using drugs, and stealing the money to support my addiction. I offered to take a polygraph test and a drug test. Blackwater declined to administer either test to me. Instead, Blackwater docked my pay for the amount of the missing cash.

17. Despite being fearful about Krebs and Richardson's intentions to destroy my reputation and frame me for taking cash that I had not taken, I continued to investigate their wrongdoing. On March 24, 2006, when the vendor bill for the hydrogen and nitrogen was inadvertently sent to me, I called the vendor, and learned that the vendor had been instructed to bill Moyock directly instead of billing the Louisiana site. I placed a call to Julie Brouse, the assistant program manager located in Moyock, and alerted her to the fraud, and asked if she had any knowledge. I told her about my concern that Krebs and Richardson were engaged in fraud, and intended to retaliate against me for uncovering their actions. I had some concerns that Brouse might be complicit in the fraud, because

Krebs, Knight, Richardson, Jim Hodge, and James Flatley had run up a dinner bill of more than $1000 taking Brouse out to dinner and drinks. (I had been forced to reimburse the participants.) Brouse was very vague, but claimed she was unaware of the fraud and that I should share my concerns directly with Greg Krebs.

18. The next day, March 25, 2006, I asked Greg Krebs to meet with me, and discuss the vendor bill. Instead, he called me into his office, and told me that he was "streamlining the staff." Greg Krebs was very blunt. He told me that I would never win a medal for saving the government money, and that I needed to back off. He then terminated me.

19. Fearful about my family's financial security in light of the termination, I asked Greg Krebs to ensure that Blackwater did not also retaliate against my husband Brad Davis, whose income had become essential to our family. Blackwater has a "Do Not Use" list, which prevents any rehiring. I was worried that Richardson and Krebs would try to place Brad on that list in retaliation for my efforts to reduce the fraudulent conduct.

20. I also contacted James Flatley and begged him to overrule Krebs. Flatley was well aware of the financial misconduct in Louisiana because I had communicated my concerns directly to him as well as to Krebs and Richardson. Nonetheless, Flatley refused to overrule Krebs' termination of me from the contract, claiming that he had to show support for the senior Blackwater management in Louisiana.

21. The Blackwater structure vested all true termination power in the executives in Moyock, not in anyone on the ground in Louisiana. Despite my pleas, and despite Flatley's direct and personal knowledge of the fraud by Krebs and Richardson, Flatley ratified Richardson's termination of me.

22. At this point, on April 3, 2006, my husband Brad Davis sat down with Greg Krebs, with whom he had worked closely in Ba'Qubah. Brad asked Krebs not to retaliate against him as a result of my efforts. Krebs promised Brad that as long as everything was "cool" between the two men, there would be no further problems. Shortly thereafter, Krebs sent his assistant George Kelly to Brad's sites. Kelly attempted to suborn perjury from Brad's

subordinates. Kelly asked the subordinates to claim that Brad was giving them money for non-reimbursable items and allowing them to sign in on days they did not actually work. Brad's subordinates refused to go along with the attempted set-up, and instead alerted Brad to Kelly's machinations.

23. Brad confronted George Kelly in the parking lot, and told him to tell his boss Krebs that Krebs should simply ask Brad to leave rather than try to set him up. The next day, April 4, 2006, Krebs called Brad into his office, and asked him to leave Louisiana. Krebs promised Brad that he would not place Brad on the "Do Not Use" list.

24. In late April or early May 2006, Brad and I left Louisiana and traveled up to Moyock, hoping that Brad and I would be able to continue to work for Blackwater on different contracts under persons other than Krebs and Richardson.

25. In early July 2006 we learned from Blackwater employee Jessica Potter that Greg Krebs and George Kelly tried to have my husband Brad Davis placed on the "Do Not Use" list but was prevented from doing so by Julie Brouse. In addition, we learned that Brad's profile had been altered in the BEARS database, which is the database that includes all of the candidate qualifications. His profile did not include his deployments, military positions and weapons qualifications. Instead, his profile was blank. As a practical matter, this resulted in Brad being passed over for positions for which he was fully qualified.

26. Julie Brouse recommended that Brad take a "static" position in Iraq with an "Other Government Agency," which paid substantially less. Brad agreed, as we had no alternatives at that point. Brad successfully completed the training, and was waiting to be cleared to deploy. Those clearances take some time to complete, so Jessica Potter recommended that we contact David Jackson, who was in charge of the IRI, Mamba and Team House, about deploying on the IRI contract until my OGA clearance came through. Brad contacted Jackson, and obtained a C1, first-line management job, on the IRI contract.

27. In the meantime, I had applied for and obtained an hourly employee position with Blackwater, working in the finance team for the State Department WPPS contract. At that time, Mike Garton headed up the finance team, and needed a cost reimbursable clerk. I began on July 12, 2006.

28. I worked on Task Order No. 4 (Afghanistan) and Task Order No. 6 (Baghdad). There were approximately 1600 persons on the two contracts.

29. Shortly after I was hired, I asked for guidance on the cost accounting. As a result of my request, a group of Blackwater personnel (including me) attended a meeting with Paul Desolites, Department of State. Mr. Desolites advised us that any costs billed to Task Orders Nos. 4 and 6 had to be costs actually incurred by Blackwater making payments to third parties. Intra-company transfers from one Blackwater entity to another were not permitted to be submitted for reimbursement under the terms of the Task Orders.

30. After the Department of State meeting educated me on the permissibility of various practices, I discovered a substantial amount of fraudulent billing. One of the first items I uncovered was Blackwater billing for payments made to a prostitute. I came across the name of a female Phillipino on the expenses submitted for cost reimbursables in connection with Task Force No. 4. At that time, to my knowledge, the only third country nationals we had in country in Afghanistan were Columbians. I wanted to figure out whether we had Phillipinio third country nationals as well because I had not seen any others beyond this name.

31. I contacted Susan Bergman, who was the logistics operations manager in Kabul, Afghanistan. She informed me that the woman was not a third country national hired to serve as a static guard, but rather was a prostitute, who had been ousted from the hotel where she was working for several Blackwater men. As a result, they put her on the Blackwater payroll under the Morale Welfare Recreation ("MWR") category. To the best of my knowledge, Blackwater billed her plane tickets and monthly salary to the United States under the Task Orders.

32. Blackwater also defrauded the United States by colluding with a man named Sargon Hendrich. Mr. Hendrich was a Californian who had lived in Afghanistan for many years. He provided some services to Blackwater, such as finding an Internet company. But Blackwater paid him far more than the services were worth, and billed the entire amount to the United States. Based on my email conversations with employees located in Afghanistan, I formed that view that Mr. Hendrich likely either directly remitted a portion of what he received back to Blackwater executives or indirectly remitted funds to them by covering the costs incurred by these Blackwater executives for constant extravagant parties.

33. Blackwater also defrauded the United States by having its wholly-owned offshore subsidiary Greystone create false invoices for plane tickets. When I began to review the documentation for plane tickets, I learned that Blackwater was paying twice for each trip an employee traveled between the United States and Amman, which served as the transit point to Iraq.

34. Blackwater corporate would issue a ticket for the person's travel. In addition, a travel agency in Amman named DAKKAK would issue a ticket for the same person's travel, and receive payment from Blackwater corporate. Greystone American Express "ghost" cards (at least 2) were given to DAKKAK to us at will for ticket charges. The Greystone executive in Amman, J.D. Stratton, would take the Blackwater-issued corporate tickets and trade them in for cash from the airlines.

35. After I discovered the double-billing, I questioned how to bill the government given Blackwater's lack of valid documentation reflecting actual costs for travel. I estimated the documentary discrepancies would prevent Blackwater from billing approximately $8 million in cost reimbursements.

36. My questioning about the permissibility of billing the United States for travel occurred during a meeting with Blackwater CFO Mike Taylor, Greystone accounting manager

Patrick Martin, Blackwater travel director Carol Bruce, and Blackwater Senior Cost Analyst Mike Garton.

37. Blackwater was unwilling to forgo any potential income from the United States. Instead, Blackwater CFO Taylor directed me and the others to travel to Amman to work directly with DAKKAK to create phony invoices, also in agreement to this was Blackwater Chief Operating Officer, Fred Roitz.

38. Blackwater, in addition to filing false invoices concocted to look as if they were from a third party, also filed invoices for flights that had been made on the wholly-controlled Presidential Airways subsidiary, not on commercial flights. The false records included claims for flights based exclusively on the personnel musters of names (which were in the United States' possession) without regard to whether the flights had been taken on the CASA or Metro 21 planes wholly owned and operated by Presidential Airways, a sister company to Blackwater.

39. These wholly-owed and operated planes knowingly kept inaccurate manifests of who flew into Iraq. The manifest would include false names or designations such as VIP, GS, or DSS in addition to some actual names. These manifests were never submitted to the United States Government.

40. Upon learning that the manifests were inaccurate, and that the actual expenses had not been memorialized contemporaneously, Mike Taylor advised that Blackwater should not bill the United States for anything lacking the necessary and complete documentation. Taylor's advice was rejected and overruled by Fred Rotiz, who directed that the invoices based on the inaccurate manifests be submitted to the United States for payment.

41. I was concerned with this directive, and asked Fred Roitz whether this constituted fraud. He replied that creating the phony invoices was simply "confirming" what should have been recorded in the first instance.

42. Patrick Martin, Carol Bruce and I traveled to Amman on February 8, 2007. We stayed at the Bristol Hotel, which is the hotel that houses Blackwater personnel. We worked

around the clock to generate false invoices that matched the travel dates shown on the Blackwater personnel musters. An example of the type of musters we used is attached as Exhibit 1. A sample of a false invoice from DAKKAK is attached as Exhibit 2. We were preparing all this documentation in order to permit Blackwater to submit false claims to the United States.

43. Patrick Martin directed that the invoices show full rates for a standard ticket ($1200) without regard to any available discounts, which I later learned typically reduced the actual ticket price to $600. In addition, the invoices were crafted to include a $100 fee for DAKKAK, a foreign exchange rate dictated by Martin, and then an additional two percent charge attributed to American Express. There was no effort by anyone to ascertain actual charges by American Express, actual ticket prices charged for the travel, or the actual exchange rates that had been used for any past transaction.

44. During our stay in Amman, the Blackwater team created false invoices for all plane tickets for trips occurring during February 2006 through September 2006. We placed these false invoices in large containers referred to as "pelican boxes", and hand-carried them back to the United States.

45. These invoices did not match the amounts that Blackwater actually paid to DAKKAK. These invoices were not limited to amounts paid to DAKKAK, but also included charges for flights that had occurred on Blackwater's captive Presidential Air airlines.

46. In addition, the Blackwater team took with us personnel muster and manifests that related to trips taken during October to December 2006, and January to March 2007.

47. Patrick Martin and Carol Bruce, before leaving Amman, instructed DAKKAK to continue to generate false travel records to match these musters and manifests.

48. DAKKAK willingly participated in this invoice-concocting exercise in exchange for Blackwater continuing to use and pay the agency.

49. After this trip to Amman, Blackwater realized that it would be able to defraud the United States to a greater degree by creating the appearance of a third-party travel agency.

(DAKKAK was a third party travel agency, albeit one willing to conspire with Blackwater.)

50. Blackwater travel director Carol Bruce had previously worked for Carlson Wagonlit. She had access to software that permitted invoices to be printed out as if they had been generated by Carlson Wagonlit, rather than Blackwater itself.

51. Blackwater Carol Bruce, acting with knowledge and participation by Fred Roitz, Gary Jackson and David Rogers, purchased and began to use this Carlson Wagonlit software to generate false invoices for all travel paid for by Blackwater and its various entities.

52. Blackwater directed all its employees and contractors to go through Blackwater travel, a wholly-captive entity. Yet Blackwater then created travel invoices that created the false impression that the travel had been booked by an unrelated third party, Carlson Wagonlit.

53. The submission of these false invoices began in or around February 2007 and, to my knowledge, continues to the present date. Each and every claim made based on a Carlson Wagonlit invoice is a false claim.

54. Blackwater also defrauded the United States by defrauding the Internal Revenue Service. Blackwater completely owned and controlled Greystone, which was an offshore company. Blackwater would transfer significant amount of funds to Greystone, and then show it on the Blackwater books as if the funds had been paid for management fees and other expenses not directly cost reimbursed, but rather covered with the fixed fee part of the contract. In this manner, Blackwater was able to falsify its books to reduce the amount of profit appearing as a result of its contracts with the United States. Blackwater used and is using this mechanism. My belief is that this practice was aimed at avoiding taxes.

55. Blackwater initially was very pleased with my performance. On or about May 19, 2007, Blackwater awarded me a plaque and financial award recognizing my "contributions" to Finance. But the situation deteriorated when Blackwater sent me back to Amman for a second time in June 2007.

56. Mike Garton of Blackwater had directed me to go to Amman and audit the finances. But the Blackwater team in Amman, Steve and Tabitha Tidwell, prevented me from getting any access to the records. During my trip, I pressed to look at financial records, but was not permitted to do so. I emailed back to my boss, Mike Garton, telling him that the Tidwells seemed to think I was there for vacation rather than to audit the records.

57. Shortly before my departure back to the United States, Steve Tidwell confronted me in the sports bar at the Hotel Bristol. He was worried that I was going to tell Moyock that he and his wife were not properly operating the program. I told him that I was going to get back to Moyock, and let them handle the various issues raised by the Tidwell's refusal to cooperate with the financial reviews. In response, Tidwell threatened me in several ways. First, he claimed that I had been spreading rumors about sexual activity between Dave Rogers, Deputy Director of State Department Programs, and April Ritchie, the office manager. Second, he threatened physical harm to my husband Brad, who was slated to deploy to Iraq. Tidwell stated "just remember, accidents happen all the time, and all it takes is one phone call."

58. Upon my return to Moyock, I learned that Blackwater was intent on terminating me. Blackwater Human Resources asked Joseph Schmidt of the Prince Group (another Blackwater entity) investigate the allegations. Mr. Schmidt interviewed me for five hours and subsequently recommended that Blackwater transfer me to Presidential Airways or some other controlled company to resolve the disputes. Instead, Andrew Howell, the General Counsel, asked me to sign a corrective action form falsely characterizing my actions.

59. Thereafter, in September, 2007, my physicians informed me that the stress of such a workplace was contributing to the return of my cancer. I took a leave of absence to protect my health.

60. While I was on leave, Blackwater Human Resources terminated me. This termination occurred on or about February 1, 2008.

61. In addition to the foregoing information, my husband Brad Davis and I have provided extensive documents with additional relevant details to AUSA Candalmo.  Our counsel is maintaining a set of these documents available for any additional review desired by the Department of Justice.

_____
Melan H. Davis

Executed on 30 day of September, 2008.