IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA ex rel.   )
MELAN DAVIS and BRAD DAVIS,   )
        Plaintiffs,   )
        )     Case No. 1:08cv1244
      v.   )
        )
ERIK PRINCE, et al.,   )
        Defendants.   )

## MEMORANDUM OPINION

In this *qui tam* action[1] brought under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-

33, the relators allege that defendants knowingly submitted false claims to the United States in

connection with two government contracts for the provision of private security services: (1) a

Department of Homeland Security ("DHS") contract to provide security services in the aftermath

of Hurricane Katrina; and (2) a State Department contract to provide security services in Iraq and

Afghanistan. As typically occurs in FCA actions, defendants challenge jurisdiction at the

threshold, contending that the relators' claims and allegations were publicly disclosed prior to the

filing of this suit and that neither relator is an "original source" as required by § 3730(e)(4). For

the reasons that follow, defendants' motion to dismiss on jurisdictional grounds must be granted

in part and denied in part. It must be granted with respect to the relators' claim that defendants

billed for worthless services in Iraq and Afghanistan under the Worldwide Personal Protective

---

[1] The phrase "qui tam" is taken from the longer Latin expression "qui tam pro domino rege quam pro se ipso in hac parte sequitur," meaning "who brings the action for the king as well as for himself." *See* William Blackstone, *Commentaries on the Law of England* 160 (1768). Thus, as numerous courts recognize, a *qui tam* action is one to recover a penalty, brought by an informer pursuant to a statute where one portion of the recovery goes to the informer and the other portion to the state. *See, e.g., Williams v. Wells Fargo & Co.*, 177 F. 352 (8th Cir. 1910); *United States ex rel. Rodriquez v. Weekly Publ'ns*, 74 F. Supp. 763, 765 (S.D.N.Y. 1947); *Erickson v. Am. Ins. of Bio. Scis.*, 716 F. Supp. 908, 909 n.1 (E.D. Va. 1989).

Services ("WPPS") II contract. It must be denied with respect to the relators' remaining claims, and, therefore, those claims proceed.

I.[2]

## A. Parties

The relators, Brad and Melan Davis, are a married couple who were residents of Connecticut at the time this suit was filed.[3] Both of the relators were previously employed as independent contractors on government contracts between one or more of the corporate defendants and the United States. Of the six named defendants in this suit, five are corporate entities and one is an individual. The five corporate entities are: (1) Blackwater Security Consulting, LLC; (2) Xe Services LLC; (3) U.S. Training Center, Inc. ("USTC"); (4) Greystone Limited ("Greystone"); and (5) The Prince Group LLC. Other than their names, the second amended complaint ("SAC") provides virtually no information about the corporate defendants. The SAC refers to three of the corporate defendants—Blackwater Security Consulting, LLC, Xe Services LLC, and USTC—as "Blackwater," and alleges that "Blackwater" provided security services pursuant to contracts with DHS and the State Department. SAC ¶ 13. The SAC also alleges that Greystone has offices in both Virginia and North Carolina, and that Greystone "was used to perpetuate [sic] the fraud on the State Department." *Id.* ¶ 14. With respect to The Prince Group LLC, the complaint alleges only that it is a corporate entity "created to hold funds obtained through both lawful and illegal means." *Id.* ¶ 12. The only named individual

---

[2] The facts stated herein are derived from the pleadings and attached exhibits, which exhibits are appropriately considered on a motion to dismiss pursuant to Rule 12(b)(1), Fed. R. Civ. P., for lack of subject matter jurisdiction. *See Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004) ("Generally, when a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.").

[3] The relators currently reside in Rhode Island. *See* B. Davis Tr. at 16-17.

defendant, Erik Prince, is a resident of McLean, Virginia, who allegedly owns and controls the corporate defendants. *Id.*

## B. Statement of Facts

In general, the relators allege they discovered multiple schemes to defraud the government while working on Blackwater's contracts with DHS and the State Department. Specifically, the relators allege as follows: Brad Davis was initially hired by Blackwater to serve as a security contractor on the Security Services Iraq ("SSI") contract to guard State Department officials in Iraq. During his first Iraq deployment (April 27 – August 1, 2005), he alleges that on three occasions his fellow Blackwater team members preemptively fired at Iraqi vehicles while providing security for convoys. *See* B. Davis Statement of Material Disclosure ("SMD") ¶¶ 12-23. He further alleges that all of the incidents were initially videotaped and voice recorded, but the tapes were erased to prevent anyone from reviewing the incidents. *Id.* ¶ 24.

After returning from Iraq, Brad Davis worked as an area manager on Blackwater's contract with DHS to provide security services in the wake of Hurricane Katrina ("Hurricane Katrina contract"). During his time on the Hurricane Katrina contract (October 2005 – April 2006), he claims to have obtained first-hand knowledge of fraud by Blackwater employees. Specifically, he alleges that Blackwater managers in Louisiana failed to maintain accountability of weapons purchased for the contract, and that Blackwater managers failed to hire qualified personnel. *Id.* ¶¶ 34-35. He also alleges that Blackwater managers falsified time sheets, known as GSA 139 forms, by noting that personnel were on duty when they were not actually working. *Id.* ¶¶ 36-38.

After he was terminated from the Hurricane Katrina contract, Blackwater re-hired Brad Davis to serve as a security contractor in Iraq on the International Republic Institute ("IRI")

contract.[4] *Id.* ¶ 42. During his second Iraq deployment, he alleges that he learned about, but did not witness, another use-of-force incident in which a Blackwater contractor allegedly shot and killed an Iraqi for no reason. *Id.* ¶ 47. He further alleges that Blackwater officials were aware that this particular individual had already had an earlier use-of-force incident, but that Blackwater was unwilling to terminate his employment because he still owed Blackwater for his tuition for attending Blackwater Academy, a training school that prepares individuals to serve as private security contractors. *Id.* ¶¶ 48-49. After returning from his second deployment to Iraq, Brad Davis served as an instructor at Blackwater's training facility in North Carolina from December 2006 to February 2008. *See* B. Davis Tr. at 106:16-20.

Melan Davis was initially hired by Blackwater to serve as a billing clerk on the Hurricane Katrina contract. During her time on the Hurricane Katrina contract (January 18 - March 25, 2006), she alleges that she observed substantial billing fraud. Specifically, she alleges that Blackwater gave its employees cash disbursements for unauthorized items such as bar tabs, spa trips, protein shakes, haircuts, and gym memberships. *See* M. Davis SMD ¶ 6. She also alleges that Blackwater employees engaged in other fraudulent activities, such as inflating payments to vendors, double-billing for expenses, and billing for mislabeled expenses. *Id.* ¶¶ 8, 10, 12. Finally, she alleges that she was terminated by Blackwater after she notified her supervisors of the fraud. *Id.* ¶ 18.

Following her termination from the Hurricane Katrina contract, Melan Davis applied for, and obtained, another position at Blackwater, serving as a cost reimbursable clerk on the finance

_____

[4] Brad Davis alleges that he was terminated from the Hurricane Katrina contract in retaliation for his wife's discovery of substantial billing fraud. *See* B. Davis SMD ¶ 41. Neither the SAC nor the SMD explains why Blackwater re-hired Brad Davis after terminating him from the Hurricane Katrina contract.

team responsible for administering the WPPS contracts.[5]  *Id.* ¶ 27.  During her second period of employment (July 12, 2006 – February 1, 2008), Melan Davis alleges that she uncovered a substantial amount of billing fraud on the WPPS contract.  Specifically, she alleges that Blackwater billed for the services of a prostitute under the Morale Welfare Recreation ("MWR") category.  *Id.* ¶ 31.  She also alleges that Blackwater overbilled the government for the services of an individual named Sargon Henrich, who remitted a portion of the payments to Blackwater executives as kickbacks.  *Id.* ¶ 32.  Further, she alleges that Blackwater committed fraud with respect to travel expenses by double-billing for travel expenses, overcharging for travel expenses, and creating phony invoices to make it appear that Blackwater employees traveled on commercial airlines when they actually traveled on Blackwater's wholly-owned subsidiary, Presidential Airways.  *Id.* ¶¶ 33-53.  Finally, Melan Davis claims she was terminated on or about February 1, 2008 after she had an altercation with Blackwater executives.  *Id.* ¶¶ 55-60.

### C. Proceedings to Date

The relators initiated the instant *qui tam* action on December 1, 2008.  In their original two-count complaint, the relators alleged that Erik Prince and nine corporate defendants[6] were liable for violating multiple provisions of the FCA, and for wrongfully terminating Melan Davis.  *See United States ex rel. Davis v. Prince*, 1:08cv1244 (E.D. Va. Dec. 1, 2008) (Complaint).  The original complaint was filed under seal, and the relators served a copy of the complaint and their written disclosures on the government, pursuant to 31 U.S.C. § 3730(b)(2).  After the government declined to intervene in this action, the complaint was unsealed and served on

---

[5] Neither the SAC nor the SMD provides the reasons for Melan Davis's rehiring.

[6] The corporate defendants named in the original complaint are: (1) Blackwater Lodge and Training Center, Inc.; (2) Blackwater Security Consulting, LLC; (3) Blackwater Armor and Targets, LLC; (4) Blackwater Logistics, LLC; (5) Blackwater Canine; (6) Raven Development Group, LLC; (7) Greystone; (8) The Prince Group LLC; and (9) EP Investments, LLC.

defendants. *See United States ex rel. Davis v. Prince*, 1:08cv1244 (E.D. Va. Feb. 2, 2010) (Order).

On April 14, 2010, the relators filed an amended complaint in which they dropped a number of defendants from the action[7] and added additional allegations to supplement their FCA claims. *See United States ex rel. Davis v. Prince*, 1:08cv1244 (E.D. Va. Apr. 14, 2010) (First Am. Compl.) ("FAC"). Specifically, the relators alleged in the FAC that Blackwater was awarded two government contracts for private security services: (1) a DHS contract to provide security services in the aftermath of Hurricane Katrina; and (2) a State Department contract to provide security services in Iraq and Afghanistan. The FAC further alleged that defendants submitted false claims with respect to both contracts by falsifying employee time sheets, inflating reimbursable expenses, and providing worthless services.

Defendants then moved to dismiss the FAC, and following briefing and argument, the relators' claims for worthless services were dismissed for failure to comply with the requirements of Rule 9(b), Fed. R. Civ. P. *See United States ex rel. Davis v. Prince*, 1:08cv1244 (E.D. Va. July 2, 2010) (Order). Further, Erik Prince and The Prince Group LLC were dismissed as defendants because the FAC did not demonstrate that the relators had "substantial prediscovery evidence" of their involvement in the alleged fraudulent scheme. *Id.* The relators' claim for wrongful termination was also dismissed for failure to state a claim upon which relief could be granted. *Id.*

Thereafter, the relators filed a motion to amend the FAC, which was accompanied by a memorandum of law and a proposed SAC. Defendants filed a brief in opposition. After reviewing the parties' briefs, the relators were granted leave to file the SAC, which re-pled the

---

[7] The named defendants in the First Amended Complaint are: (1) Erik Prince; (2) Blackwater Security Consulting, LLC; (3) Xe Services LLC; (4) USTC; (5) Greystone; and (6) The Prince Group LLC.

worthless services allegations and the claims against Erik Prince and The Prince Group LLC. *See United States ex rel. Davis v. Prince*, 1:08cv1244 (E.D. Va. July 22, 2010) (Order). The relators chose not to re-plead the claim for wrongful termination of Melan Davis. *Id.*

Defendants have now moved to dismiss the SAC for lack of subject matter jurisdiction because the relators' claims are "based upon" public disclosures, and the relators are not an "original source" of the information on which their claims are based.[8] After a hearing on defendants' motion to dismiss, the parties were ordered to complete jurisdictional discovery within thirty days and to submit supplemental briefing on the jurisdictional issue. *See United States ex rel. Davis v. Prince*, 1:08cv1244 (E.D. Va. Aug. 27, 2010) (Order). The jurisdictional discovery period has now ended and both parties have submitted supplemental briefs.

### D. SAC

Because the jurisdictional analysis focuses sharply on the SAC's allegations, a detailed description of those allegations is warranted. The SAC, in two counts, alleges that defendants are liable under multiple provisions of the FCA for defrauding the government in connection with two government contracts for private security services. Specifically, the SAC alleges that DHS awarded Blackwater a contract (HSCEFC-05-J-F00002) to provide private security services in the aftermath of Hurricane Katrina. The SAC further alleges that from October 2005 to July 2006, defendants submitted false claims to DHS under the Hurricane Katrina contract on a monthly basis, and that the claims were false in at least three respects. First, Blackwater employees falsified government time sheets, known as GSA 139 forms, by reporting that people were at work on days when they were absent. SAC ¶ 19. Second, defendants inflated the

---

[8] Defendants subsequently moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), arguing that the new allegations in the SAC should be dismissed because the relators failed to file the SAC under seal, as required by the FCA. This motion is addressed in a separate Order.

amount of reimbursable expenses by paying Blackwater employees for expenses not actually incurred and double billing for certain expenses. *Id.* ¶ 20. Third, Blackwater billed the government for worthless services because Blackwater managers failed to maintain accountability over weapons and failed to ensure that Blackwater did not give weapons to felons or other persons disqualified from carrying weapons under the Lautenberg Act, 18 U.S.C. § 922(g)(9). *Id.* ¶ 21. According to the SAC, the false claims submitted by Blackwater to DHS on the Hurricane Katrina contract caused the government to pay Blackwater $33.3 million dollars more than was required by the terms of the contract. *Id.* ¶ 22.

The SAC also alleges that the State Department awarded Blackwater the WPPS II contract to provide security services in Iraq and Afghanistan.[9] According to the SAC, defendants submitted false claims to the State Department on a monthly basis from June 2005 to May 2009, resulting from at least three separate fraudulent schemes. First, Blackwater submitted inflated "muster sheets," which were the documents that recorded how many persons were providing security services in Iraq and Afghanistan on a given day. *Id.* ¶ 27. Second, Blackwater submitted false documentation that inflated the amount of cost-reimbursements for travel and other expenses. Specifically, the SAC alleges that Blackwater (i) billed the government for payments to related entities, including Greystone and Presidential Airways; (ii) overpaid a man named Sargon Hendrich for services and billed the entire amount to the government, and (iii) used a software program to generate travel documentation that looked as if it came from an unrelated third party. *Id.* ¶¶ 28-32. Third, Blackwater billed the government for worthless

_____

[9] In his deposition, Brad Davis testified that the SAC alleges fraudulent billing on the WPPS contract as a whole, which he defined to include: (i) the WPPS I contract; (ii) the WPPS II contract; and (iii) the SSI contract. *See* B. Davis Tr. 135:15-136:10. Because the SAC cannot be amended by deposition testimony, and because the WPPS II contract is the only contract for security services in Iraq and Afghanistan referenced anywhere in the relators' SAC, it follows that the SAC does not state a plausible claim for fraud in connection with any State Department contracts other than the WPPS II contract. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

services because it provided unqualified personnel to provide security services on the WPPS II contract, including security contractors who (i) repeatedly used excessive and unjustified force, (ii) took steroids, and (iii) sold weapons illegally. *Id.* ¶¶ 33-48. According to the SAC, these fraudulent schemes caused the government to pay Blackwater $1.2 billion more than it should have been paid. *Id.* ¶ 66.

The question presented by defendants' motion to dismiss is whether the claims in the SAC were publicly disclosed before the relators' filed the SAC, and if so, whether the relators qualify as an "original source" of the information underlying their fraud claims. This action was stayed until the parties conducted discovery and submitted supplemental briefing on the jurisdictional issue. *See United States ex rel. Davis v. Prince*, 1:08cv1244 (E.D. Va. Aug. 27, 2010) (Order). As the parties have completed jurisdictional discovery and submitted their briefs, the issue is now ripe for disposition.

**II.**

The FCA imposes civil liability on any person who knowingly submits false claims to the government. *See* 31 U.S.C. §§ 3729-3733. To encourage the disclosure of fraud that might otherwise escape detection, the FCA permits private individuals to file *qui tam* actions on the government's behalf against perpetrators of the fraud and to share in the proceeds recovered in successful actions. *See* 31 U.S.C. § 3730(b)(1), (d). Significantly, not every claim of fraud by a relator qualifies under the FCA; instead, the FCA bars federal courts from exercising subject matter jurisdiction over certain *qui tam* actions. *See* 31 U.S.C. § 3730(e)(1)-(4).[10] Pertinent here is § 3730(e)(4), referred to as the "public disclosure bar," which provides as follows:

---

[10] The actions that are barred include: (i) certain actions against members of the armed forces; (ii) actions against Members of Congress, members of the judiciary, or senior executive branch officials; (iii) actions based upon allegations or transactions which are the subject of a

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A),(B) (1986-2010).[11] The purpose of the public disclosure bar is "to prevent 'parasitic' *qui tam* actions in which relators, rather than bringing to light independently-discovered information of fraud, simply feed off of previous disclosures of government fraud." *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1347 (4th Cir. 1994); *see also United States ex rel. Springfield Railway Terminal Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994) (noting that Congress has amended the public disclosure bar on multiple occasions in an effort to find "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own.").

The first step in determining whether the public disclosure bar eliminates federal court jurisdiction over a putative FCA action is to identify the claims in the relator's complaint. This is an important step, as the public disclosure bar must be applied on a claim-by-claim basis.

---

civil suit or an administrative civil money penalty proceeding; and (iv) actions based upon public disclosures.

[11] Although § 3730(e)(4) was amended on March 23, 2010, the pre-amendment version of the statute applies in this case because the Supreme Court has already determined that the amended statute does not apply retroactively. *See Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 130 S. Ct. 1396, 1400 n.1 (2010).

*See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 477 (2007).[12] To achieve this goal, a district court must identify each claim "based on a review of the substance of the complaint, not just how it may be formally structured." *United States ex rel. Boothe v. Sun Healthcare Group, Inc.*, 496 F.3d 1169, 1177 (7th Cir. 2007). In other words, even if a relator groups multiple claims into a single count, a district court must apply the jurisdictional analysis to each "reasonably discrete claim of fraud." *Id.* (holding that jurisdictional analysis must be applied to ten discrete claims of fraud, even though the relator lumped all of her claims into a single count).

Once the relator's claims have been properly identified, a district court must then determine whether each of the claims is barred by the public disclosure bar. The Fourth Circuit follows a three-step approach to determine whether the public disclosure bar applies. *See United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, 528 F.3d 292, 299 (4th Cir. 2008), *overruled on other grounds by Wilson*, 130 S. Ct. at 1411. First, a district court must determine whether there is a "public disclosure" within the meaning of the FCA that covers the claim in question. *See* 31 U.S.C. § 3730(e)(4)(A). If not, the claim is not subject to the public disclosure bar. If there is a public disclosure that covers the claim, the district court must then determine whether the relator's claim is "based upon" the public disclosure. *Id.* If not, the claim is not barred. But if the claim is "based upon" the public disclosure, the district court must determine whether the relator is an "original source" of the information on which his claim is based. *Id.* The relator has the burden of proving each jurisdictional fact by a preponderance of the evidence. *See United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009).

---

[12] *See also United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, No. 07-1322, 2010 WL 3869825, at *2 (4th Cir. Oct. 1, 2010) (holding that district courts must address "jurisdictional questions on a claim-by-claim basis") (citing *Rockwell*, 549 U.S. at 476).

## A. Public Disclosure

To determine whether there is a qualifying "public disclosure" relating to a claim, a district court must address three issues. The first issue that must be resolved is whether the disclosure occurred in one of the sources enumerated in the statute. Under § 3730(e)(4)(A), a qualifying public disclosure can occur in three sources: (1) in a "criminal, civil, or administrative hearing"; (2) in a "congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation"; or (3) in the "news media." 31 U.S.C. § 3730(e)(4)(A). In the Fourth Circuit, "[t]he list of disclosure sources is exclusive; a public disclosure of fraud operates as a jurisdictional bar against a *qui tam* plaintiff's action only if the public disclosure is through one of the specified sources." *Wilson*, 528 F.3d at 301 n.3 (citing *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 870 (4th Cir. 1999)).

The second issue that must be addressed as part of the public disclosure inquiry is whether the disclosure was made "public" prior to the filing of the complaint.[13] *See Wilson*, 528 F.3d at 307 (holding that an administrative investigation or report is not a qualifying public disclosure unless "the investigation or report is in fact publicly disclosed"). Although the Fourth Circuit has not construed the term "public" as used in § 3730(e)(4)(A), other circuits have done so, reaching essentially similar results. Thus, in the First Circuit, "[t]he general rule is that a

---

[13] In their initial opposition brief, the relators argued that a qualifying public disclosure must occur prior to the relators' disclosure of information to the government, which allegedly occurred on April 25, 2008. *See* Pls.' Opp'n Br. (Doc. No. 49) at 3. This argument is meritless. To qualify as a public disclosure, the information must have been revealed prior to the filing of the SAC. *See Rockwell*, 549 U.S. at 474 (holding that "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction"). To hold otherwise would impermissibly allow a relator with direct and independent knowledge of a minor fraud claim to file an FCA action and then amend the complaint to include more substantial theories of fraud based upon subsequent public disclosures.

disclosure is 'public' if it is generally available to the public."[14] Similarly, in the Second, Third,

and Tenth Circuits, a disclosure is "public" when allegations of fraud are affirmatively disclosed

to "strangers to the fraud."[15] Finally, the Seventh Circuit and the D.C. Circuit have both

concluded that a public disclosure occurs when allegations of fraud are placed in the "public

domain."[16]

The final—and perhaps the most difficult—issue is whether the public disclosure reveals

"allegations or transactions," and not merely information. *See Springfield*, 14 F.3d at 653;

*United States ex rel. Purdue Pharma LP*, 582 F. Supp. 2d 766, 770 (W.D. Va. 2008). Although

the Fourth Circuit has not specifically construed the phrase "allegations or transactions" within

the meaning of § 3730(e)(4)(A), many circuit courts have done so, adopting the D.C. Circuit's

interpretation of the phrase.[17] In *Springfield*, the D.C. Circuit defined "allegation" simply as "a

conclusory statement implying the existence of provable supporting facts." *Springfield*, 14 F.3d

at 653-54. The not-so-simple D.C. Circuit definition of "transaction" employs algebraic notation

as follows:

> [I]f $X + Y = Z$, $Z$ represents the allegation of fraud and $X$ and $Y$
> represent its essential elements. In order to disclose the fraudulent

---

[14] *United States ex rel. Poteet v. Bahler Med., Inc.*, 619 F.3d 104, 110 (1st Cir. 2010).

[15] *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1158 (2d Cir. 1993); *United States ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 332 (3d Cir. 2005); *United States ex rel. Fine v. Advanced Scis., Inc.*, 99 F.3d 1000, 1005 (10th Cir. 1996).

[16] *United States ex rel. Feingold*, 324 F.3d 492, 495 (7th Cir. 2003); *Springfield*, 14 F.3d at 654.

[17] *See United States ex rel. Atkinson v. P.A. Shipbuilding Co.*, 473 F.3d 506, 519 (3d Cir. 2007); *United States ex rel. Jones v. Horizon HealthCare Corp.*, 160 F.3d 326, 331 (6th Cir. 1999); *Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1044 (8th Cir. 2000); *United States ex rel. Found. Aiding the Elderly v. Horizon West Inc.*, 265 F.3d 1011, 1015 (9th Cir. 2001); *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1050-51 (10th Cir. 2004) (applying the *Springfield* analysis).

> transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed.

*Id. at* 654. The D.C. Circuit further held that the essential elements of fraud are a misrepresented state of facts (the X element) and a true state of facts (the Y element). *Id.* at 655. Thus, a qualifying "public disclosure" must reveal either: (1) an allegation of fraud; or (2) a false state of facts and a true state of facts from which fraudulent activity may be inferred.[18] Both types of disclosures satisfy the underlying purpose of the public disclosure requirement, which is to "put the government on notice to the possibility of fraud." *United States ex rel. Gilligan v. Medtronic,* 403 F.3d 386, 389 (6th Cir. 2005).[19]

Defendants' argue, unpersuasively, that *Springfield* does not provide the appropriate standard for "allegations or transactions" in the Fourth Circuit. Their argument rests solely on the Fourth Circuit's decision in *United States ex rel. Siller v. Becton Dickison & Co.,* 21 F.3d 1339 (4th Cir. 1994). Defendants misread *Siller*; that case focuses on construing the words "based upon," and not on construing the phrase "allegations or transactions." Specifically, in

---

[18] *See United States ex rel. Poteet v. Bahler Med., Inc.,* 619 F.3d 104, 110 (1st Cir. 2010) ("To be a disclosure 'of fraud' the disclosure must contain either (1) a direct allegation of fraud, or (2) both a misrepresented state of facts and a true state of facts so that the listener or reader may infer fraud.") (internal citations omitted); *Dingle v. Bioport Corp.,* 388 F.3d 209, 212 (6th Cir. 2004) ("Either a public disclosure which includes an allegation of fraud, or a public disclosure that describes a transaction that includes both the state of facts as they are plus the misrepresented state of facts must be present to eliminate jurisdiction in a case."); *United States ex rel. Purdue Pharma L.P.,* 582 F. Supp. 2d 766, 770 (W.D. Va. 2008) ("[I]t is sufficient that there have been either (1) disclosures of both a false state of facts and a true state of facts (not necessarily from the same source) so that fraud is implied; or (2) disclosure of an allegation of fraud, regardless of the specificity of the allegation.").

[19] *See also United States ex rel. Feingold v. Adminastar Federal Inc.,* 324 F.3d 492, 496 (7th Cir. 2003) ("[T]he function of a public disclosure is to bring to the attention of the relevant authority that there has been a false claim against the government."); *Springfield,* 14 F.3d at 655 (holding that presence of only a misrepresented state of facts or a true state of facts, but not both, "cannot be expected to set government investigators on the trail of fraud").

*Siller*, the relator's complaint contained allegations that were substantially similar to allegations made against the defendant in an earlier lawsuit. *Id.* at 1341. The Fourth Circuit construed the words "based upon" in § 3730(e)(4) to mean that a relator's *qui tam* action is barred only if his allegations are "derived from" a public disclosure, and it remanded the case to the district court to determine whether the relator actually derived his allegations from the earlier complaint. *Id.* at 1348-50. In *dicta*, the Fourth Circuit stated, in remanding the case, that "we do not upset the district court's express finding that the same essential facts underlay both" the earlier lawsuit and the relator's *qui tam* action. *Id.* at 1349. From this statement, defendants argue that, in the Fourth Circuit, a public disclosure need not reveal an allegation of fraud or a false and true state of facts from which fraud may be inferred, but rather it must simply contain the "essential facts" that form the basis of the relator's FCA claim. *See* Def's. Mot. to Dismiss (Doc. No. 110) at 8-10. Yet, carefully read, *Siller* is entirely consistent with the standard announced in *Springfield*. While it is true that the Fourth Circuit refused to disturb the district court's finding that the same "essential facts" underlay the prior complaint and the relator's complaint, its basis for doing so was that the prior complaint and the relator's complaint contained the same allegation of fraud, namely that the defendant was overcharging the government for medical device products. *Id.* at 1349-50. In other words, the Fourth Circuit concluded, in *Siller*, that the earlier complaint was a qualifying public disclosure because it contained the same allegation of fraud that the relator made in his *qui tam* complaint. Thus, in the absence of a Fourth Circuit pronouncement to the contrary, it is reasonable to conclude that the Fourth Circuit would adopt the sensible standard in use in the majority of circuits. Accordingly, to qualify as a "public disclosure," a disclosure must reveal an allegation of fraud, or a false and true state of facts from which fraud may be inferred.

## B. Based Upon

A public disclosure, by itself, does not trigger the public disclosure bar under the pre-2010 FCA; rather, the relator's allegations must also be "based upon" the public disclosure. 31 U.S.C. § 3730(e)(4)(A). The majority view in the circuit courts is that "a lawsuit is based upon publicly disclosed allegations when the relator's allegations and the publicly disclosed allegations are substantially similar." *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 915 (7th Cir. 2009) (collecting cases). The Fourth Circuit, however, adheres to the minority, indeed now singular, view[20] that a *qui tam* action is barred only if the relator's allegations are actually derived from public disclosures:

> [A] relator's action is "based upon" a public disclosure of allegations only where the relator has actually derived from that disclosure the allegations upon which his *qui tam* action is based. Such an understanding of the term 'based upon,' apart from giving effect to the language chosen by Congress, is fully consistent with section 3730(e)(4)'s indisputed objective of preventing 'parasitic' actions, . . . for it is self-evident that a suit that includes allegations that happen to be similar (even identical) to those already publicly disclosed, but were not actually derived from those public disclosures, simply is not, in any sense, parasitic.

*Siller*, 21 F.3d at 1348; *see also Grayson v. Advanced Mgmt. Tech., Inc.*, 221 F.3d 580, 582 (4th Cir. 2000) ("We have interpreted 'based upon' to be synonymous with 'derived from.'").

*Siller*'s interpretation of "based upon" has been criticized by many circuits because its emphasis on plain meaning results in an interpretation of § 3730(e)(4) that renders the "original source" requirement superfluous. *See, e.g.*, *Glaser*, 570 F.3d at 915.[21] Notwithstanding this

---

[20] The Fourth Circuit is the only circuit that adheres to this interpretation of "based upon." At one time, the Seventh Circuit also followed the minority view. *See United States v. Bank of Farmington*, 166 F.3d 853, 864 (7th Cir. 1999). Recently, however, the Seventh Circuit overruled *Bank of Farmington* and adopted the majority view. *See Glaser*, 570 F.3d at 914-21.

[21] The public disclosure bar permits a relator to maintain a *qui tam* suit even if the relator's allegations are "based upon" a public disclosure so long as the relator is an "original

criticism, *Siller* remains the law in the Fourth Circuit for cases prior to the FCA's 2010 amendment.[22] Thus, "a *qui tam* action will not be barred if the plaintiff's claims are similar or even identical to the publicly disclosed allegations, so long as the plaintiff had independent knowledge of the facts and did not derive his allegations from the public disclosure itself." *Wilson*, 528 F.3d at 308. Moreover, it is important to note that § 3730(e)(4) bars jurisdiction over a relator's claim if the claim is even partly derived from a public disclosure. *See Jadhav*, 555 F.3d at 351.

### C. Original Source

If a relator's claim is based upon a public disclosure, the claim is barred unless the relator can prove that he or she is an "original source." Section 3730(e)(4)(B) defines "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B). In the Fourth Circuit, "[a] putative relator's knowledge is 'direct' if he acquired it through his own efforts, without an intervening agency, and it is 'independent' if the knowledge is not dependent on public disclosure." *Grayson*, 221 F.3d at 583. Further, while a relator does not need to have direct and independent knowledge of all the information on which a *quit tam* action is based, the relator must have direct and

---

source." To qualify as an "original source," a relator must have direct and independent knowledge of the information on which his allegations are based. The primary difficulty with the minority interpretation of "based upon" is that "a relator who 'actually derived' his allegations of fraud from . . . information in the public domain [can] never avoid the jurisdictional bar by showing that he has 'independent knowledge' of the fraud." *Glaser*, 570 F.3d at 916. Put differently, "once a court concludes that a lawsuit is actually derived from publicly disclosed information, asking the original-source questions never affects the jurisdictional result." *Id.*

[22] It is worth noting that the amended § 3730(e)(4)(A) no longer uses the phrase "based upon" and now bars claims "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . ." 31 U.S.C. § 3730(e)(4)(A) (2010).

independent knowledge of the facts necessary to plead a plausible fraud claim. *See Jadhav*, 555 F.3d at 353 (denying "original source" status to a relator who did not have direct and independent knowledge of one of the elements of his FCA claim); *United States ex rel. Detrick v. Daniel F. Young*, 909 F. Supp. 1010, 1019 (E.D. Va. 1995) (holding that relator's direct and independent knowledge must meet the requirements of Rules 9(b) and 11 of the Federal Rules of Civil Procedure).

**III.**

The first step in the FCA jurisdictional analysis is to identify each reasonably discrete claim of fraud in the SAC. In this respect, it is clear, as the Seventh Circuit noted, that a district court should not assume that the number of fraud claims corresponds with the number of counts. *Boothe*, 496 F.3d at 1177. Instead, a court must review the substance of the relator's complaint and identify the allegations that give rise to "a discrete and independent cause of action for fraud." *Id.* Here, while the relators have grouped their fraud allegations into two counts, a review of the substance of their complaint reveals that they have identified six discrete claims of fraud. Specifically, the relators allege that defendants defrauded DHS in connection with the Hurricane Katrina contract by: (1) falsifying employee time sheets to increase labor charges; (2) inflating the amount of cost-reimbursable expenses; and (3) providing worthless services. In addition, the relators allege that defendants defrauded the State Department in connection with the WPPS II contract by: (1) falsifying muster sheets to increase labor charges; (2) inflating the amount of travel and other expenses; and (3) providing worthless services. Thus, the elements of the public disclosure bar must be applied individually to each of the six claims.

## A. Hurricane Katrina Contract

Defendants' jurisdictional challenge to the relators' Hurricane Katrina fraud claims fails at the first step: none of the more than fifteen public disclosures cited by defendants refers to the Hurricane Katrina contract.[23] Thus, put simply, defendants have not only failed to present a *qualifying* public disclosure, they have failed to identify *any* public disclosure of the allegations in the relators' complaint relating to the Hurricane Katrina contract. Thus, the relators' claims relating to that contract are not barred by § 3730(e)(4).

Despite their failure to point to any qualifying public disclosure relating to the Hurricane Katrina contract, defendants argue that the relators' claims are nonetheless barred for three reasons. First, in their initial brief, defendants concede that the relators have stated multiple claims for fraud, but they argue that the claims relating to the WPPS II contract are barred by public disclosures, and "[i]f *any part* of the relator's action is based on a public disclosure, the entire action, not just the claims derived from the public disclosure, is jurisdictionally barred." Def.'s Mot. to Dismiss (Doc. No. 37) at 7. This argument is unavailing because none of the three cases cited by defendants stand for the proposition that an entire action involving multiple claims must be dismissed if allegations relating to one claim are based on public disclosures. Instead, defendants' cited cases hold that if a particular claim is even partly derived from a public disclosure, there is no jurisdiction over that specific claim.[24] Here, there are no public disclosures relating to the Hurricane Katrina contract, and therefore, defendants do not have a

---

[23] Among the public disclosures cited by defendants are two administrative audits, a congressional hearing transcript, multiple civil complaints, a criminal indictment, and multiple news articles, none of which focuses on the Hurricane Katrina contract.

[24] *Jadhav*, 555 F.3d at 351; *United States ex rel. Ackley v. IBM Corp.*, 76 F. Supp. 2d 654, 661-62 (D. Md. 1999); *Detrick*, 909 F. Supp. at 1019.

persuasive argument that the claims relating to that contract are even partly disclosed or derived from a qualifying public disclosure.

Although defendants appear to concede in their later briefs that a single barred claim in a multi-claim complaint does not operate to bar all claims, they nonetheless argue that the Hurricane Katrina claims are barred because they are "combined" with the claims relating to the WPPS II contract. Defendants' argument proceeds as follows: First, defendants note that relators' complaint consists of only two counts, one count for billing the government for services not provided and a second count for providing worthless services. Next, defendants argue that each count depends on allegations relating to both the Hurricane Katrina contract and the WPPS II contract. Finally, defendants conclude that even if the public disclosures relate only to the WPPS II contract, each *count* is partly derived from public disclosures, and, therefore, each *count* must be dismissed in its entirety. This argument fails because, as discussed above, the jurisdictional analysis must be applied to each "reasonably discrete claim of fraud" in the relators' complaint, regardless of whether the claims are grouped together in a single count. *See Boothe*, 496 F.3d at 1177. Here, there are six discrete claims for fraud—three claims relating to the Hurricane Katrina contract and three separate claims pertaining to the WPPS II contract. Notwithstanding defendants' argument to the contrary, the allegations supporting each claim are not merged together, and, therefore, public disclosures pertaining solely to the WPPS II contract cannot serve to prevent relators from prosecuting claims relating to the Hurricane Katrina contract.

Finally, defendants argue in a footnote, again unpersuasively, that the relators' fraud claims relating to the Hurricane Katrina contract should be dismissed for lack of subject matter jurisdiction because the relators do not have direct and independent knowledge of those claims.

- 20 -

*See* Def's. Mot. to Dismiss (Doc. No. 110) at 28 n.12. This argument runs afoul of the settled

principle that where there is no qualifying public disclosure, § 3730(e)(4) does not bar a relator's

claims, even if the relator is not an "original source." *See Wang v. FMC Corp.*, 975 F.2d 1412,

1416 (9th Cir. 1992). Thus, because there are no public disclosures relating to the Hurricane

Katrina contract, the relators may prosecute their claims relating to that contract even if they do

not have direct and independent knowledge of those claims.

### B. WPPS II Contract

Each of the relators' fraud claims pertaining to the WPPS II contract is separately

addressed.

#### 1. False Muster Sheets

The relators allege that defendants are liable under the FCA for submitting false muster

sheets to the government, which resulted in the government overpaying for labor costs. SAC ¶

27. While defendants argue that this claim is barred by § 3730(e)(4), the only public disclosure

identified by defendants that relates to muster sheets is the 2005 State Department Office of

Inspector General Audit Report ("2005 OIG Audit Report"). The first step in the jurisdictional

analysis is to determine whether the 2005 OIG Audit Report is a qualifying public disclosure

within the meaning of § 3730(e)(4), which in turn requires determining: (1) whether the 2005

OIG Audit Report is an acceptable source; (2) whether the 2005 OIG Audit Report was publicly

disclosed; and (3) whether the 2005 OIG Audit Report reveals "allegations or transactions."

Here, the first two requirements are clearly satisfied, but the third is not, as the 2005 OIG Audit

Report does not disclose "allegations or transactions" relating to false musters.

First, there is no doubt that the 2005 OIG Audit Report qualifies as an "administrative

audit" within the plain meaning of § 3730(e)(4). *See* 31 U.S.C. § 3730(e)(4)(A); *see also United*

*States ex rel. Waris v. Staff Builders, Inc.*, No. 96-1969, 1999 WL 788766, at \*4 (E.D. Pa. Oct. 4, 1999) ("[T]he Inspector General's audit report is a paradigmatic example of an 'administrative audit,' which is rendered a public disclosure by the plain wording of Section 3730(e)(4)(A).").

Similarly, there is no doubt that the 2005 OIG Audit Report was publicly disclosed, given that the 2005 OIG Audit Report was "generally available to the public" beginning in December 2007 when it was posted on an internet website maintained by the online publication Talking Points Memo. *Poteet*, 619 F.3d at 110. Moreover, the audit report was obtained by Talking Points Memo pursuant to a Freedom of Information Act ("FOIA") request, and materials released by the government in response to an FOIA request are publicly disclosed within the meaning of § 3730(e)(4)(A). *See, e.g., United States ex rel. Atkinson v. PA. Shipbuilding Co.*, 437 F.3d 506, 526 (3d Cir. 2007).

By contrast, the third requirement—whether the 2005 OIG Audit Report reveals "allegations or transactions" relating to false muster sheets—is not met. To begin with, the 2005 OIG Audit Report does not disclose any allegation of fraud (Z). *See Springfield*, 14 F.3d at 654. The 2005 OIG Audit Report reveals that some of the muster sheets submitted to Blackwater's headquarters in Moyock, North Carolina inaccurately stated that an employee was "in-country" (*i.e.*, working at an overseas duty station) when in fact the employee was in a travel status or otherwise not physically present at the duty station. But, importantly, the 2005 OIG Audit Report does not allege that Blackwater personnel in Moyock submitted those inaccurate muster sheets to the State Department. If anything, the 2005 OIG Audit Report suggests that Blackwater employees in Moyock identified errors in the muster sheets by comparing the information in the musters with other sources (*e.g.*, travel vouchers, itineraries, etc.) to ensure that the muster sheets accurately reported whether an employee was "in-country." To be sure,

the audit report clearly expresses dissatisfaction with the fact that Blackwater does not require its employees to fill out time sheets in which they certify the number of hours worked each day, but there is no allegation of fraud or wrongdoing by anyone. *See United States ex rel. Ven-A-Care v. Actavis Mid Atl. LLC*, 659 F. Supp. 2d 262, 267 (D. Mass. 2009) (holding that even though government reports established that Medicaid was paying too much for drugs, the reports did not "broadcast" an allegation of fraud because there was no discussion of the reasons for the overcharge or any suggestion of wrongdoing by the defendants).

Moreover, the 2005 OIG Audit Report does not disclose both a misrepresented state of facts (X element) and a true state of facts (Y element) from which fraud may be inferred. *See Springfield*, 14 F.3d at 655. Under the relators' theory, the misrepresented state of facts is that the muster sheets are accurate; the true state of facts is that the muster sheets inflate the amount of time Blackwater employees are actually working. Here, the audit report does not reveal the content of the muster sheets that were actually submitted to the government (X element), nor does it reveal the true facts from which it could be inferred that those muster sheets were inaccurate (Y element). *See Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1044 (8th Cir. 2002) (holding that administrative audit was not a public disclosure because it did not reveal the true state of the facts); *United States ex rel. Found. Aiding the Elderly v. Horizon West Inc.*, 265 F.3d 1011, 1016-17 (9th Cir. 2001) (holding that surveys were not qualifying public disclosures because they did not reveal a misrepresented state of facts that had been submitted to the government). Because defendants have not identified a qualifying public disclosure, the relators are not barred from prosecuting their claim that Blackwater falsified muster sheets in order to increase labor charges on the WPPS II contract.[25]

_____

[25] Even if the 2005 OIG Audit Report qualifies as a public disclosure, the record evidence establishes that the relators did not derive their allegations from the 2005 OIG Audit Report. *See*

## 2. Inflated Expenses

The relators allege that defendants are liable under the FCA for defrauding the government in connection with the WPPS II contract because they inflated the amount of reimbursements for travel and other expenses. SAC ¶¶ 28-32. According to the SAC, one of the ways in which Blackwater inflated expenses was by improperly billing the government for payments made to related entities.[26] Specifically, the SAC alleges that Blackwater paid funds to Greystone, an affiliated company, and reflected those payments on monthly claims to the State Department as reimbursable management fees paid to unrelated parties. The SAC also alleges that Blackwater billed the government for flights on its wholly owned subsidiary, Presidential Airways, as if it were an independent commercial airline.

Defendants argue that the relators' claim that Blackwater improperly billed the government for payments made to related entities is barred by § 3730(e)(4) because the claim was publicly disclosed in the 2005 OIG Audit Report. Specifically, defendants have identified

---

*Siller*, 21 F.3d at 1348. To begin with, the relators have independent knowledge of the facts underlying their false muster claim. During her deposition, Melan Davis testified that she worked as a billing clerk on the WPPS II contract, and in the course of her employment, she learned that Blackwater submitted claims to the government based on muster sheets. *See* M. Davis Tr. 47:6-48:10; 63:3-12; 100:10-16; 105:22-106:2. She further testified that at least some of the musters were false because there were obvious discrepancies between the dates on the muster sheets and dates on related travel documentation. *See* M. Davis Tr. 55:10-57:4; 109:20-110:16; 117:6-10. Moreover, the evidence in the record suggests that it is more likely than not that the relators derived their allegations from their own independent knowledge, and not the audit report, because Melan Davis's knowledge of the facts is relatively extensive whereas the muster sheets received only a passing reference in the 2005 OIG Audit Report.

[26] The SAC also alleges that Blackwater improperly inflated expenses by creating false invoices for reimbursable services from a third party named Sargon Hendrick, and by using a software program to generate false travel documentation. None of the public disclosures identified by defendants reveal these two schemes. Thus, the claims arising from these two fraudulent schemes are not barred by the public disclosure bar because there was no public disclosure of these allegations. *See Wang*, 975 F.2d at 1416.

two different sections of the 2005 OIG Audit Report that they claim qualify as a "public disclosure." The first section of the audit provides as follows:

> Our review disclosed that in addition to G[eneral] & A[dministrative] costs applied to total direct costs in Note 5 to Exhibit A, the contractor included G&A expenses in its proposed O[ther] D[irect] C[ost]s. This results not only in a duplication of G&A, but also a pyramiding of G&A because, in effect, Blackwater is applying G&A to G&A. The contractor contends that it is "entitled" to do this because the ODCs are being incurred by a "separate" business unit with a separate Tax ID Number (Blackwater Training Center) and then billed to Blackwater Security Consulting, which is responsible for the operational aspects of this contract.
>
> We find no basis to support this contention. Blackwater Training Center, although it does have a separate Tax ID Number, is in effect a profit center under Blackwater Lodge and Training Center, Inc., under common management control. In fact, the G&A expense pool identified in Note 5 to Exhibit A contains the management costs for both Blackwater Security Consulting and Blackwater Training Center. As a result, we have questioned G&A expenses included in ODCs in total.

The second pertinent section of the audit report states as follows:

> The Aerial Services for this contract are to be provided by what the contractor claims is an "affiliated" company. This company, Presidential Airways, a.k.a. Blackwater Aviation, currently maintains its own separate payroll and accounting system. However, it is still under the same general management and control as Blackwater Security Consulting and Blackwater Training Center, although to a lesser degree. All of the companies fall under The Prince Group and Blackwater USA and its president.

There can be little doubt that the 2005 OIG Audit Report is a qualifying public disclosure. As stated above, there is no question that the audit report satisfies the first two elements of the public disclosure inquiry because an "administrative report" qualifies as an acceptable source under the plain meaning of § 3730(e)(4)(A), and the evidence in the record is clear that the report was publicly disclosed prior to the filing of the SAC. Moreover, the third

requirement is also satisfied here because unlike the section of the 2005 OIG Audit Report dealing with muster sheets, the portions of the 2005 OIG Audit Report dealing with payments to related entities reveal "allegations and transactions" of fraud within the meaning of § 3730(e)(4)(A).

To begin with, the 2005 OIG Audit Report discloses allegations of fraud. This conclusion finds support in *Dingle v. Bioport Corp.*, 388 F.3d 209 (6th Cir. 2004). There, the relators alleged that Bioport Corporation ("Bioport") made false claims to the U.S. government when it supplied anthrax vaccines that were manufactured in a manner inconsistent with Food and Drug Administration ("FDA") guidelines. Specifically, the relators alleged that Bioport changed the type of filter from a "stinted glass filter" to a "low-protein-binding nylon membrane filter," and this change violated both FDA regulations and Bioport's contract with the federal government. Bioport argued that the relators' claim was barred by the public disclosure bar because, prior to the filing of the complaint, a witness testified in a congressional hearing that "the vaccine may not be the same one approved by the FDA." Agreeing with Bioport, the Sixth Circuit concluded that the witness's testimony was a public disclosure of the relators' allegations even though the witness was alleging fraud with respect to a different aspect of the vaccine manufacturing process. According to the Sixth Circuit, "[t]he words fraud or allegations need not appear in the disclosure for it to qualify," nor "does the allegation have to be exactly what Relators' allege." *Id.* at 214. An allegation of fraud satisfies the "allegations or transactions" requirement "[s]o long as the government is put on notice to the potential presence of fraud." *Id.* at 214-15.

Here, the 2005 OIG Audit Report discloses that Blackwater improperly billed the government for payments made to related parties and gives at least two examples of this conduct.

First, the 2005 OIG Audit Report discloses that Blackwater charged the government for G&A expenses incurred by Blackwater Training Lodge, which the auditors concluded was under the same management and control as other Blackwater entities. Second, the 2005 OIG Audit Report reveals that Blackwater classified Presidential Airways as an independent company when in fact it also falls under the same management and control as the other Blackwater entities. While the 2005 OIG Audit Report does not use the word "fraud" or disclose that Blackwater improperly charged the government for fees paid to Greystone, the 2005 OIG Audit Report was more than sufficient to put the government on notice that Blackwater was characterizing related entities as totally independent companies and improperly billing the government for payments made to those entities.

Because the 2005 OIG Audit Report is a qualifying public disclosure, the next step in the analysis is to determine whether the relators' claim that defendants impermissibly billed the government for payments to related entities was "derived from" the 2005 OIG Audit Report. *Siller*, 21 F.3d at 1348. The relators have the burden of proving that their claim was not derived from the audit report. *See Jadhav*, 555 F.3d at 348.[27] To satisfy this burden, the relators must prove that they have independent knowledge of the facts underlying their claim and that they

---

[27] The relators' argument that defendants do not have a Rule 11 evidentiary basis to assert that the relators derived their allegations from the public disclosures is without merit. Relators cite no authority for the proposition that defendants must submit evidence that the relators derived their allegations from a public disclosure before the burden shifts to the relators to prove that their allegations were not derived from those disclosures. The law is to the contrary, for it is well-settled that a plaintiff has the burden of establishing the facts giving rise to subject matter jurisdiction. *See Jadhav*, 555 F.3d at 347-48. Once a defendant challenges the existence of the court's jurisdiction over an FCA claim by identifying a public disclosure, the relator has the burden of proving that his allegations were not derived from the public disclosure. *Id.* at 348.

derived their allegations from their own independent knowledge. *See Wilson*, 528 F.3d at 308; *Siller*, 21 F.3d at 1349.[28]

Here, the record evidence shows that the relators have independent knowledge of the critical facts underlying their claim. Specifically, in her SMD, Melan Davis states that soon after she was hired as a cost reimbursable clerk, she met with a State Department official who provided her with guidance on submitting claims for reimbursement, and the official advised her that payments to related companies were not eligible for reimbursement. *See* M. Davis SMD ¶ 29.[29] She further testified during her deposition that another employee told her that Blackwater was submitting invoices to the State Department for fees paid to Greystone, and that she allowed bills for flights made on Presidential Airways to be forwarded to the State Department. *See* M. Davis Tr. 182:20-183:12; 185:19-186:5. Finally, she testified that she notified Blackwater executives of the fraudulent billing practices. *See* M. Davis Tr. 186:8-17.

---

[28] The relators argue that they have provided sufficient evidence that they did not derive their allegations from the public disclosures identified by defendants because they submitted affidavits stating that they did not base any of the allegations in the SAC on the public disclosures identified by defendants. But it is well-settled that relators cannot satisfy their burden of proving jurisdictional facts by submitting affidavits with conclusory statements. *See United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162 (10th Cir. 1999).

[29] *See also* M. Davis Tr. 184:19-185:4

> Q: And what's the basis for your belief?
>
> A: Because my understanding, again, any time that you submitted a charge to Department of State, per Paul Desiletz from Department of State, it had to be a third party that it was coming from.
>
> Q: So no charges whatsoever were allowed from an affiliated company, was your understanding of what Mr. Desiletz told you; is that right?
>
> A: That's right.

Moreover, the record evidence establishes that it is more likely than not that the relators derived their allegations from their own personal knowledge, and not from the 2005 OIG Audit Report. To begin with, the 2005 OIG Audit Report reveals that Blackwater improperly charged the government for G&A expenses incurred by Blackwater Training Lodge, but it does not disclose that Blackwater was billing the State Department for management fees paid to Greystone. The lack of similarity between the allegations made in the 2005 OIG Audit Report and the relators' complaint is significant proof that the relators did not derive their allegations from the audit report. *Cf. United States ex rel. Lowman v. Hilton Health Sys., LP*, 487 F. Supp. 2d 682, 693 (D.S.C. 2007) (holding that relator did not derive allegations from public disclosure, in part, because the relator's complaint alleged wrongdoing never mentioned in the public disclosure). Further, while the 2005 OIG Audit Report mentions Presidential Airways, on this record, it seems more likely that the relators derived their allegations relating to Presidential Airways from the facts learned by Melan Davis during her employment in Blackwater's billing department than from a single paragraph in a heavily redacted audit report that was published online and does not provide any details about fraudulent payments involving Presidential Airways.

Thus, the relators have satisfied their burden of proving that their claim that Blackwater was improperly billing the government for payments made to related entities came from their own knowledge, and not from the pertinent sections of the 2005 OIG Audit Report. Accordingly, the public disclosure bar does not prevent the relators from prosecuting this claim.[30]

---

[30] This finding in no way addresses the merits of the relators' claim. It is, of course, quite possible that Blackwater only submitted claims to the government for payments made to Greystone and Presidential Airways that were allowed under the WPPS II contract. But that is a merits issue that is appropriately resolved at the summary judgment stage. Here, the only issue is whether the relators' are filing a "parasitic" lawsuit based on allegations in the public domain, and the evidence in the record indicates that they are not.

### 3. Worthless Services

Relators allege that defendants defrauded the government by providing unqualified personnel to perform security services in Iraq and Afghanistan. Specifically, the relators allege that the WPPS II contract contains material terms outlining the qualifications for private security contractors, and that defendants violated these contractual terms by using security contactors who (1) used excessive and unjustified force, (2) took steroids and other drugs, and (3) sold weapons illegally.[31] Defendants argue that the relators' worthless services claim is derived from a bevy of documents that disclosed the problems with Blackwater's employees long before the relators filed the SAC. For the reasons that follow, the relators' "worthless services" claim is barred by § 3730(e)(4)(A) because their claim is derived, at least in part, from public disclosures and the relators do not qualify as an "original source" of the information underlying their claim.

The first step in the public disclosure analysis is to determine whether the disclosures identified by defendants are qualifying "public disclosures" within the meaning of § 3730(e)(4)(A), and the first issue in the public disclosure inquiry is whether each disclosure occurred in a listed source. Here, the public disclosures identified by defendants occurred: (1) in a 2007 congressional hearing transcript; (2) in a 2009 State Department OIG Audit Report; (3) in multiple civil complaints filed before the SAC; (4) in a criminal indictment; and (5) in multiple news articles. Each of these sources fall within § 3730(e)(4)(A)'s list of acceptable sources. A congressional hearing qualifies as an appropriate source because the statute expressly states that a qualifying public disclosure may occur "in a *congressional*, administrative, or Government

---

[31] This claim is barely plausible under Rule 12(b)(6). It requires the relators to prove that defendants knew that security contractors who lacked the qualifications set forth in the WPPS II contract could not provide any worthwhile security services. In other words, it requires the relators to prove that providing security contractors who lacked the qualifications in the WPPS II contract is analogous to providing lifeguards who could not swim.

Accounting Office report, *hearing*, audit, or investigation." *See* 31 U.S.C. § 3730(e)(4)(A) (emphasis added). Likewise, the news articles qualify as acceptable sources because the statute provides that a public disclosure may occur in the "news media." *Id.* Further, as stated above, an OIG report is a "paradigmatic example," of an "administrative report." *Waris*, 1999 WL 788766, at *4. Finally, both civil complaints and criminal indictments constitute "hearings" within the meaning of the statute. *See Siller*, 21 F.3d at 1350 (holding that the disclosure of allegations in a civil complaint constitutes a public disclosure in a "civil hearing"); *Feingold v. Associated Ins. Cos.*, No. 98-C-4392, 2001 WL 1155250, at *5 (N.D. Ill. Sept. 28, 2001) (criminal indictments are public disclosures within the meaning of the FCA).

The second issue is whether each of the sources was in fact publicly disclosed. *See Wilson*, 528 F.3d at 307. Here, the evidence in the record establishes that all of the public disclosures identified by defendants were "generally available to the public" prior to the filing of the SAC on July 26, 2010. *Poteet*, 619 F.3d at 110. The civil complaints and the criminal indictment were filed in the public record with various courts between 2007 and 2009.[32] The congressional hearing was held on October 2, 2007, and the news articles were published in newspapers or online between 2007 and 2009. Finally, the 2009 OIG Audit Report was released to the public in June 2009.

The third issue is whether the public disclosures identified by defendants reveal the "allegations or transactions" underlying the relators' worthless services claim. To reiterate, a public disclosure reveals "allegations or transactions" when it discloses an allegation of fraud or the critical elements of a fraud claim from which fraud can be inferred. *See Springfield*, 14 F.3d

---

[32] *See Siller*, 21 F.3d at 1350 ("[A]ny information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure of allegations in a civil hearing for purposes of section 3730(e)(4)(A)."); *Feingold*, 2001 WL 1155250, at *5 (concluding that two criminal indictments were publicly disclosed for purposes of the FCA).

at 654. Here, this requirement is satisfied because the evidence in the record reveals that some of the public disclosures identified by defendants contain allegations that Blackwater was providing unqualified personnel. In addition, the public disclosures also reveal the critical elements of the relators' worthless services claim.

To begin with, the evidence in the record contains two public disclosures of allegations that defendants provided unqualified personnel to perform security services. First, defendants identified an e-mail that was read into the record during the 2007 congressional hearing dealing with private security companies. The e-mail states as follows:

> By necessity, the initial group hired to support the Afghanistan operation did not meet the criteria identified in e-mail traffic and had some background and experience shortfalls overlooked in favor of getting the requisite number of personnel aboard to start up on the contract.

In addition, defendants have identified a civil complaint filed by relators' counsel in a separate matter in 2007 that contains an allegation that defendants "fail[ed] to take appropriate steps in hiring proper personnel to perform services." *See Estate of Atban v. Blackwater USA*, 1:07cv1831, ¶ 96 (D.D.C. Oct. 11, 2007).

Both of these disclosures constitute allegations of fraud. The e-mail read into the record of the 2007 congressional hearing states that Blackwater hired security contractors with "background and experience shortfalls." The e-mail does not contain the word fraud, nor does it specify that Blackwater personnel were unqualified for the reasons alleged by the relators (*i.e.*, excessive force, drugs, weapons smuggling). Nonetheless, an allegation that Blackwater was employing personnel with "background and experience shortfalls" was more than sufficient to place the government on notice that Blackwater was billing for unqualified personnel, regardless of the reason for the lack of qualifications. *See Dingle*, 388 F.3d 214-15. Likewise, the

allegation in the complaint filed by the relators' counsel that Blackwater "fail[ed] to take appropriate steps in hiring proper personnel to perform services" was also sufficient to put the government on notice that Blackwater was potentially billing for unqualified personnel. *Id.*

Even if the two public disclosures identified above are not allegations of fraud within the meaning of § 3730(e)(4)(A), the disclosures identified by the defendants reveal the critical elements of the worthless services claim. Ordinarily, the elements of a fraud claim pertinent to the public disclosure bar are a misrepresented state of facts and a true state of facts. *See Springfield*, 14 F.3d at 655. But a worthless services claim does not require an affirmative misrepresentation; rather, a worthless services claim is premised on the deficiency of the services provided to the government. *See Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir. 2001). Here, the relators allege that defendants billed for worthless security services because they provided unqualified personnel, and they further allege that some of Blackwater's security contractors were unqualified under the terms of the WPPS II contract because they used excessive force; took steroids and other drugs; and sold weapons illegally. Thus, the critical elements of the relators' claim that must be disclosed in order for the government to infer fraud are: (1) the terms of the WPPS II contract; and (2) facts showing that at least some contractors: (i) engaged in excessive and unjustified force; (ii) took steroids and other drugs; and (iii) sold weapons illegally.

Both of these elements have been publicly disclosed. First, the evidence in the record establishes that the terms of the WPPS II contract are in the public domain.[33] During her

---

[33] While it may seem reasonable to assume that the government has knowledge of its own contracts, the law is clear that the public disclosure bar is not triggered when the critical elements of a fraud claim are known to the government; rather, the critical elements must be publicly disclosed. *See United States v. Bank of Farmington*, 166 F.3d 853, 861 (7th Cir. 1999) (rejecting argument that information was publicly disclosed because it was in possession of the government), *overruled on other grounds by Glaser*, 570 F.3d at 920.

deposition, the relators' attorney admitted that she looked at a publicly disclosed copy of the WPPS II contract on the internet when preparing the FAC. *See* Burke Tr. 23:12-22. She also testified that the only portions of the WPPS II contract used thus far in this litigation were taken from the publicly disclosed version of the contract on the internet.[34] *Id.* at 24:14-21. Second, defendants submitted a number of public disclosures containing allegations that Blackwater employees were engaging in the activities that allegedly rendered them unqualified to perform any security services, including using excessive and unjustified force,[35] taking steroids and other

---

[34] It is appropriate to take judicial notice that the WPPS II contract was publicly disclosed in the "news media" because the contract was disclosed on the website of United Press International. *See* 31 U.S.C. § 3730(e)(4)(A). Moreover, the contract terms were "generally available to the public" prior to the filing of the SAC because relators' attorney testified that she reviewed the terms of the contract on the internet prior to filing the FAC. *Poteet*, 619 F.3d at 110.

[35] *See, e.g.*, House Committee on Oversight & Government Reform, Majority Staff Memorandum, at 6 ("U.S. military commanders have reported that Blackwater guards 'have very quick trigger fingers,' 'shoot first and ask questions later,' and 'act like cowboys.'"); *Id.* (noting that "Blackwater is legally and contractually bound to only engage in defensive uses of force to prevent 'imminent and grave danger' to themselves or others," yet, "the vast majority of Blackwater weapons discharges are preemptive, with Blackwater forces firing first at a vehicle or suspicious individual prior to receiving any fire"); *Id.* at 13 (noting that Blackwater terminated security contractors for "weapons-related incidents, which included two terminations for inappropriately firing at Iraqis, one termination for threatening Iraqis with a firearm, 12 terminations of negligent or accidental weapons discharges, and one termination for proposing to sell weapons to the Iraqi government"); *Estate of Atban v. Blackwater Worldwide*, 1:07cv1831, ¶ 33 (D.D.C. Nov. 26, 2007) ("Blackwater has a pattern and practice of recklessness in the use of deadly force."); *Id.* ¶ 34 ("Blackwater has created and fostered a corporate culture in which excessive and unnecessary use of deadly force by its employees is not investigated or punished in any way."); *Estate of Husein v. Prince*, 1:09cv1048, ¶ 17 (E.D. Va. Sept. 16, 2009) ("Mr. Prince's top executives openly discussed 'laying Hajjis out on cardboard' and bragged about their collective role in killing those of the Islamic faith."); *Estate of Rabea v. Prince Group LLC*, 1:09cv645, ¶ 38 (E.D. Va. Nov. 7, 2009) ("These men who engaged in the night hunting trips as well as daytime excursions to murder Iraqis included Rich Garner, Phil Abdow, Steve Babylon, Gregroy LaRue, and many others whose identities are not yet known but are capable of being discovered.").

drugs,[36] and engaging in illegal arms dealing.[37] Taken together, these disclosures are more than

sufficient to place the government on notice of the possibility that defendants were billing the

government for unqualified personnel. *See Dingle*, 388 F.3d at 214 (holding that two public

disclosures revealing the critical elements of the relators' claim, taken together, were sufficient

to "put the government on notice of the possibility of fraud").

Because the disclosures identified by defendants qualify as "public disclosures" within

the meaning of § 3730(e)(4)(A), the next step in the analysis is to determine whether the relators

have satisfied their burden of proving that their worthless services claim is not "derived from"

the public disclosures. *See Siller*, 21 F.3d at 1348. To satisfy this burden, the relators must

prove that they have independent knowledge of the facts underlying their worthless services

claim and that they derived their allegations from their own independent knowledge. *See Wilson*,

528 F.3d at 308; *Siller*, 21 F.3d at 1349. Here, the relators cannot make this showing because the

record evidence shows that they do not have independent knowledge of the pertinent terms of the

WPPS II contract, nor do they have independent knowledge that security contractors on the

WPPS II contract were unqualified.

---

[36] *See, e.g., Estate of Atban v. Blackwater Worldwide*, 1:07cv1831, ¶ 35 (D.D.C. Nov. 26, 2007) ("Blackwater routinely sends heavily-armed 'shooters' into the streets of Baghdad with the knowledge that some of those 'shooters' are chemically influenced by steroids and other judgment-altering substances. Reasonable discovery will establish that Blackwater knew that 25 percent or more of its 'shooters' were ingesting steroids or other judgment-altering substances, yet failed to take effective steps to stop the drug use. Reasonable discovery will establish that Blackwater did not conduct any drug-testing of its 'shooters' before sending them equipped with heavy weapons into the streets of Baghdad.").

[37] *Blackwater Denies Involvement in Illicit Arms Trade*, CNN.com (Sept. 22, 2007) (stating that "[f]ederal prosecutors are investigating allegations that employees of Blackwater illegally purchased weapons and sold them in Iraq"); *Estate of Atban v. Blackwater Worldwide*, 1:07cv1831, ¶ 61 (D.D.C. Nov. 26, 2007) ("According to press reports, Blackwater is being investigated for having been involved in smuggling weapons into Iraq, which subsequently ended up in the hands of persons designated as terrorists by the United States government."); *Id.* ¶ 62 ("Two Blackwater employees have plead guilty to possessing stolen weapons.").

The relators' worthless services claim is premised on the fact that the WPPS II contract contains material terms governing the qualifications of independent contractors deployed to Iraq and Afghanistan.[38] Yet, the record evidence does not establish by a preponderance of the evidence that the relators have knowledge of all the pertinent terms of the WPPS II contract. To begin with, neither relator has ever read the WPPS II contract.[39] Moreover, while both relators testified that they know what the contract requires even without reading it,[40] they failed to identify the *source* of their knowledge, which is necessary to satisfy their burden of proving that they have knowledge of the contract's terms. *See Hafter*, 190 F.3d at 1163 ("A mere assertion of knowledge, without adequate basis in fact and unsupported by competent proof is insufficient to establish jurisdiction."). Finally, when pressed, the relators conceded that their knowledge is based, at least in part, on speculation:

> I can't tell you specifically that the State Department wrote in their contract that you must not use steroids, but I'm pretty sure they shouldn't have been doing that, and it's probably somewhere in the State Department contract.[41]

Assuming, *arguendo*, that the relators have independent knowledge of the pertinent terms of the WPPS II contract, the record evidence also does not establish by a preponderance of the evidence that the relators have any knowledge that security contractors *on the WPPS II contract* were unqualified. Throughout their deposition, the relators emphasized that it was "common practice"[42] for Blackwater to deploy independent contractors to Iraq and Afghanistan who were

---

[38] SAC ¶ 34.

[39] *See* B. Davis Tr. 72:11-12; M. Davis Tr. 33:14-22.

[40] *See* B. Davis Tr. 134:14-19; M. Davis Tr. 68:1-6.

[41] *See* M. Davis Tr. 218:8-18.

[42] *See* B. Davis Tr. 128:12-13.

unqualified because of repeated use of excessive force or "bad shoots."[43] Yet, when pressed to identify the basis for this assertion, the relators testified about unqualified contractors being deployed on contracts other than WPPS II.[44] They also testified about use-of-force incidents on contracts other than WPPS II,[45] as well as incidents on the WPPS II contract that do not establish knowledge of unjustified and excessive use of force.[46] Similarly, both relators testified that it was "fairly common"[47] or "common knowledge"[48] that Blackwater deployed security contractors who used steroids, but neither relator could identify the name of a single contractor on the WPPS II contract who used steroids.[49] Finally, the relators alleged that Blackwater billed the government for security contractors who were unqualified because they sold weapons illegally, but the basis for this allegation was Brad Davis's testimony that an individual on a contract other than the WPPS II contract was illegally selling weapons in Iraq.[50]

---

[43] *See* B. Davis Tr. 128: 18.

[44] *See* B. Davis Tr. 132:8-133:11, 147:1-4; M. Davis Tr. 226:3-11.

[45] *See* B. Davis Tr. 214:20-245:5, 246:3-247:13.

[46] *See* B. Davis Tr. 155:19-156:10; M. Davis Tr. 239:10-17.

[47] *See* B. Davis Tr. 141: 6.

[48] *See* M. Davis Tr. 235: 6.

[49] At one point during his deposition, Brad Davis testified that he observed someone on the WPPS II using steroids, but he could not remember the individual's name. *See* B. Davis Tr. 154:4-14. Thus, this testimony is no better than his more general testimony that it was "common knowledge" that independent contractors were using steroids, which is insufficient to establish independent knowledge of steroid use. *See Hafter*, 190 F.3d at 1163. Moreover, given that his testimony is contradicted by other individuals on multiple occasions, his vague testimony that he saw someone on the WPPS II contract using steroids, without any additional facts, is not sufficient to satisfy his burden of proving knowledge of excessive steroid use on the WPPS II contract.

[50] *See* B. Davis Tr. 167:6-170:14.

Because the relators do not have knowledge of some of the critical facts underlying their worthless services claim, it is reasonable to infer that their claim is derived, at least in part, from public disclosures. *See Jadhav*, 555 F.3d at 351 (holding that a claim is barred by the FCA even if it is partially derived from public disclosures). This inference is even stronger where, as here, the relators' counsel has filed complaints with similar allegations in other suits,[51] and the relators' counsel has admitted to deriving some of the information underlying the worthless services claim from the public domain.[52] In any event, it is not necessary to find that the relators actually derived their allegations from the public domain; rather, it is enough that the relators have failed to satisfy their burden of proving that they did not derive their allegations from public disclosures. *See Lopez*, 698 F. Supp. 2d at 644.

Even though the relators have not satisfied their burden of proving that they did not derive their allegations from public disclosures, they can still prosecute their claim for worthless services if they qualify as an "original source." To qualify as an "original source," a relator must have direct and independent knowledge of the facts necessary to state a plausible fraud claim. *See Jadhav*, 555 F.3d at 353 (dismissing claim because relator did not have direct and independent knowledge of one of the elements of the claim); *Detrick*, 909 F. Supp. at 1019 (holding that the relator's direct and independent knowledge of fraud must satisfy the

---

[51] *Estate of Atban v. Blackwater USA*, 1:07cv1831 (D.D.C. Oct. 11, 2007) (Complaint); *Estate of Atban v. Blackwater Worldwide*, 1:07cv1831 (D.D.C. Nov. 26, 2007) (First Am. Comp.); *Estate of Atban v. Prince*, 1:09cv617 (E.D. Va. June 2, 2009); *Estate of Husein v. Prince*, 1:09cv1048 (E.D. Va. Sept. 16, 2009); *Estate of Rabea v. Prince Group LLC*, 1:09cv645 (E.D. Va. Nov. 7, 2009); *Estate of Husein v. Prince*, 1:09cv1048 (E.D. Va. Nov. 7, 2009).

[52] During her deposition, the relators' counsel admitted to copying information underlying the worthless services claim from the public domain, including at least some of the information about the WPPS II contract, the e-mail reproduced in paragraph 47 of the SAC, and the damages figures used to estimate the cost of Blackwater's fraudulent claims to the United States. *See* Burke Tr. 23:17-24:13, 183:10-16, 186:6-21.

requirements of Rules 9(b) and 11 of the Federal Rules of Civil Procedure). In the Fourth Circuit, "[a] putative relator's knowledge is 'direct' if he acquired it through his own efforts, without an intervening agency, and it is 'independent' if the knowledge is not dependent on public disclosure." *Grayson*, 221 F.3d at 583.

In this case, the relators do not qualify as "original sources" of their worthless services claim because they do not have direct and independent knowledge of the facts underlying their claim.[53] At most, the relators have direct and independent knowledge of a few use-of-force incidents in Iraq on contracts different from the WPPS II contract, common knowledge that some Blackwater contractors were using steroids, and direct and independent knowledge that one contractor was selling weapons illegally on another contract. This is plainly not enough to escape the public disclosure bar with respect to the worthless services claim pled here.

### 4. Erik Prince

The relators allege that Defendant Prince is liable for fraud because he "personally participated in the fraudulent schemes relating to the State Department contract," which include falsifying musters, inflating expenses, and providing worthless services. Defendants argue that the claims against Defendant Prince are barred by § 3730(e)(4) because the allegations relating to Defendant Prince are derived from complaints filed by the relators' attorney in other suits.[54]

---

[53] The analysis in this case supports the widespread criticism of *Siller*, *see supra* note 21 and accompanying text, that interpreting "based upon" to mean "derived from" renders the original source requirement superfluous. Because the relators did not carry their burden of proving that they did not derive their allegations from public disclosures, they cannot show that they have independent knowledge of the facts underlying their worthless services claim and hence also cannot show they are original sources.

[54] After a thorough review of defendants' pleadings, the only disclosures identified by defendants pertaining to Defendant Prince are a few paragraphs in three complaints filed by the relators' attorney in different suits. *See Estate of Atban v. Blackwater USA*, 1:07cv1831, ¶¶ 8, 59-61 (D.D.C. Oct. 11, 2007); *Estate of Husein v. Prince*, 1:09cv1048, ¶¶ 9, 17 (E.D. Va. Sept. 16, 2009); *Estate of Rabea v. Prince Group LLC*, 1:09cv645, ¶ 55 (E.D. Va. Nov. 7, 2009).

Ordinarily, the jurisdictional analysis would be applied to each of the three claims alleged against Defendant Prince; however, because the claim for worthless services is barred by § 3730(e)(4), the analysis will only be applied to the claims that Defendant Prince falsified musters and inflated expenses on the WPPS II contract. In the end, defendants' argument that the claims against Defendant Prince must be dismissed is unpersuasive because none of the public disclosures identified by defendants are qualifying public disclosures.

The public disclosures identified by defendants satisfy the first two prongs of the public disclosure inquiry because civil complaints are regarded as "public disclosures" in a "civil hearing." *See Siller*, 21 F.3d at 1350. Yet, none of the disclosures identified by defendants constitute a qualifying public disclosure within the meaning of § 3730(e)(4)(A) because the content of the complaints do not reveal "allegations or transactions." *See Springfield*, 14 F.3d at 563. Specifically, none of the disclosures identified by defendants contain an allegation of fraud. While one complaint hints at possible illegal activity by Defendant Prince when it states that he has shown "reckless indifference to the laws of this and other nations,"[55] this allegation does not put the government on notice of the possibility that Defendant Prince was allegedly falsifying musters or inflating expenses in connection with the WPPS II contract. Nothing in the complaints, moreover, discloses the essential elements of these fraudulent schemes (*i.e.*, a false state of facts and a true state of facts). Because there is no qualifying public disclosure, the public disclosure bar does not apply and the relators are not required to prove that they have direct and independent knowledge of the factual allegations in their complaint relating to the claims that Defendant Prince falsified musters and inflated expenses on the WPPS II contract.

---

[55] *See Estate of Atban v. Blackwater USA*, 1:07cv1831, ¶ 61 (D.D.C. Oct. 11, 2007).

## IV.

Accordingly, defendants' motion to dismiss for lack of subject matter jurisdiction is granted in part and denied in part. There is subject matter jurisdiction over: (i) the three claims relating to the Hurricane Katrina contract, (ii) the claim that defendants falsified muster sheets on the WPPS II contract; and (iii) the claim that defendants inflated reimbursable expenses on the WPPS II contract. There is no subject matter jurisdiction over the claim that defendants provided worthless services on the WPPS II contract.

An appropriate Order will issue.

Alexandria, Virginia
January 5, 2011

/s/
T. S. Ellis, III
United States District Judge