UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. MELAN DAVIS and BRAD DAVIS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:08-cv-1244 – TSE-TRJ |
| ERIK PRINCE, et al., | ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' EMERGENCY MOTION FOR
RECONSIDERATION OF THE COURT'S MAY 20, 2011 ORDER OR, IN THE
ALTERNATIVE, FOR A CONTINUANCE OF THE JUNE 7, 2011 TRIAL DATE**

Defendants U.S. Training Center, Inc. and Erik Prince respectfully file this memorandum

in support of their motion for reconsideration or, in the alternative, for a continuance of the trial

date, based upon the fact that the "billeting" issue – whether defendants violated the False

Claims Act by billing independent contractors in labor categories they did not work – was not in

this case until last week.[1]   There are two grounds for this motion:  (1) the information that

relators' counsel provided to the Court at the May 20th hearing was contradictory and

misleading, and hence the Court's order was premised upon a misapprehension of the facts; and

(2) that because this issue has been injected into the case on the eve of trial, defendants cannot be

prepared to defend against it by the June 7th trial date.

---

[1] All claims against former defendants, Prince Group, Blackwater Security Consulting, LLC, Xe
Services LLC and Greystone Limited have been dismissed.  (Dkt. No. 365).  Defendants'
summary judgment motion as to all claims against Erik Prince remains pending.

In its May 20, 2011 Order, this Court denied defendants' motion for summary judgment

"with respect to the claim that USTC knowingly submitted false and inflated musters to the

Department of State" (Dkt. No. 365).  The substance of this allegation is described in a single

paragraph of relators' Second Amended Complaint ("SAC"):

> 27.    The claims being submitted on a monthly basis by Blackwater to
> the State Department were materially false in several respects. First,
> Blackwater falsified the "musters," which are the records on a monthly
> basis to demonstrate **how many personnel** were on the ground and
> providing security services in Iraq and Afghanistan. Blackwater
> management intentionally submitted false and inflated musters to the
> Department of State. By so doing, Blackwater obtained by fraud
> significantly more funds than the Department would have paid had the
> musters been accurate.

Dkt. No. 32 (SAC) at 7 (emphasis added).  Yet, the Court ruled on May 20 that relators would be

able to pursue not only the claim asserted in paragraph 27 of the SAC but also a claim that

defendants billed for personnel in the wrong positions.  Ex. B (May 20, 2011 Hr'g Tr.) at 116:7-

9.

Defendants urge the Court to reconsider the ruling that the alleged billing of people in

positions that they did not work is also in this case, because the Court did not have accurate

information before it at the May 20th hearing.  The true facts are tantamount to new facts,

making reconsideration appropriate.  *Cf. Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99

F.R.D. 99 (4th Cir. 1983) (motion to reconsider may be appropriate when it is not reiteration of

previous argument).  Defendants bring this motion because the Court's ruling was based on

contradictory and misleading information provided by relators' counsel at the hearing.  This

motion is not premised on simple disagreement over the Court's ruling.

As explained in further detail below, relators, from the beginning of this case all

the way to the present, have asserted that the so-called "musters" allegation encompassed

only a *single* alleged scheme to defraud.  In the words of relators' counsel, that single

alleged scheme is that USTC **claimed money for people who *weren't* there.**  Ex. A

(July 1, 2010 Hr'g Tr.) at 29-32 (*The Court*: Tell me again what the WPPS contract

scheme was.  *Attorney Burke*: There are two different schemes.  And it's very

straightforward.  It's time and it's travel reimbursement. . . . On the personnel side, what

we said is they – you know, they phonied up their musters.  They claimed money for

people who weren't there.).

Although relators' counsel represented to the Court that defendants were on notice of the

billeting issue because of relators' use of declarations from Lyle Shepherd, Wayne Beauchamp,

and Wendy Garrow, that is not the case.  Relators did rely on declarations from Messrs.

Shepherd and Beauchamp, but only in their opposition to defendants' motion seeking summary

judgment on the WPPS II claims.  Furthermore, in doing so, relators made only an oblique

reference to testimony from these individuals regarding a second, totally different, heretofore

unpled, alleged scheme – namely, that the musters were false because, although the individuals

on the muster were in fact present, they were listed in a position for which they were not serving

(*i.e.*, a billeting allegation).  *See* Dkt. No. 329, Rels.' Mem. in Opp'n to Defs. Mot. for Summ. J.

("Rels.' Opp'n").  Relators did not rely at all on Wendy Garrow's declaration in the context of

billeting in their papers.  The section of relators' summary judgment motion that relators'

counsel cited to the Court as supporting the billeting argument alleges nothing more specific than

"employees modified the data in the musters."  *See* Ex. B (May 20, 2011 Hr'g Tr.) at 64:25-

65:19; Dkt. No. 322 (Rels.' Mem.) ¶ 31.

At the May 20, 2011 summary judgment hearing, defendants' counsel pointed out that

this billeting allegation was raised for the first time in relators' opposition to defendants'

summary judgment motion.  Ex. B (May 20, 2011 Hr'g Tr.) at 71.  Relators' counsel did not

dispute that the SAC does not explicitly raise this issue, but argued instead that the general

phrase "false and inflated musters" is broad enough to cover a billeting allegation.[2]   Before this,

relators had never expressly asserted that they intended this broad language to cover the billeting

allegation.   To the contrary, at the hearing their counsel asserted that while they were aware of a

billeting issue at the time that they filed their complaint, it was not an issue they knew to have

much of a "financial impact."  Ex. B (May 20, 2011 Hr'g Tr.) at 87-88.   Instead, their counsel

said it was something that they decided to pursue in discovery – along with numerous other

*unpled* theories that they pursued that this Court has now ruled out of this case.  *See id*. at

100:17-20; 109: 21-22; 116:1 (citing *United States ex rel. Owens v. First Kuwaiti General*

*Trading & Contracting*, 612 F.3d 724 (4th Cir. 2010)).

    That relators' billeting allegation is unpled is demonstrated by their counsel's repeated

statements to this Court and by the facts that (1) Ms. Davis, in describing her musters allegation

in her deposition, made no mention of the billeting issue,[3] (2) Messrs. Beauchamp and Shepherd

(both of whom are separately represented by relators' counsel) were added to her Rule 26(a)(1)

witness list at the eleventh hour in the discovery period, and (3) Ms. Garrow's allegations

---

[2] [Relator's counsel]: It is true that at the beginning stages of the time period, the company was
not correcting the job titles because the State Department was not enforcing something called the
[deduct] clause.  They did not begin to care who was in which job until 2008.  So the back -- the
North Carolina modification didn't -- it began immediately just for simple days.  It is only over
time that it also grew to include the modifications so that they would avoid the financial
penalties.
THE COURT:  Why is that part of your complaint?  **You didn't allege that**.
[Relators' counsel]:  **No, your Honor.**  My point is that the process of the modifications, it's the
same thing.
Ex. B (May 20, 2011 Hr'g Tr.) at 72:16-73:5 (emphasis added).

[3] Mr. Davis has not alleged any knowledge of false musters whatsoever.

concerning billeting issues only pertain to a time period well *after* the time period covered by the

SAC and, therefore, cannot support relators' allegations.[4]

Quite simply, the SAC gave defendants notice of only one allegation regarding false

musters -- that USTC **"claimed money for people who weren't there."**  Ex. A (July 1, 2010

Hr'g Tr.) at 32; see also Dkt. No. 32 (SAC) ¶ 27.  The broad language in the SAC is not enough

---

[4]  Ms. Garrow admitted in her deposition that her testimony concerning billeting referred only to the 2010 time period and not before:

| | |
|---|---|
| A. | . . .  In 2010, functioning as a scheduler, we're looking at manning, at overages and shortages and positions and labor categories. |
| Q. | So in 2008, 2009, you wouldn't have ever been contacted by Rene about an overage or shortage - - |
| A. | No. |
| Q. | - - or is that not right? |
| A. | No, I would not have talked to her in 2008, as payroll, about shortages and overages. |
| Q. | Okay.  So in 2008 and 2009, Rene only contacted you about travel discrepancies and R&R? |
| A. | That's correct. |

Ex. G (Garrow Dep. Tr.) at 73:17-74:4.  In addition to misleading the Court regarding the *relevancy* of Ms. Garrow's testimony, relators' counsel also misrepresented what Ms. Garrow stated:

> THE COURT:  Does [Ms. Garrow] say in her deposition "I saw others do it in order not to leave money on the table?"
>
> [Relators' counsel]:    Yes, your Honor.

Ex. B (May 20, 2011 Hr'g Tr.) at 69:2-5.  But  Ms. Garrow testified,

| | |
|---|---|
| Q: | And so you don't – you don't know whether Rene made a change . . . to the muster that was submitted to the Department of State? |
| A.: | No, I don't know that. |
| . . . | |
| Q: | You heard [Rene] make comments that – that gave you the understanding that she had made the change? |
| A: | Yes, sir. |

Ex. G (Garrow Dep. Tr.) at 69:2-69:6, 70:2-70:5.  Ms. Garrow *also* testified that she considered the muster to be the most accurate document.  *Id*. at 101:17-23.

to put defendants on notice of any allegation regarding improper billeting.  Indeed, relators did

not intend it to do so.  The SAC contains not a single word about labor categories.  As such, *none*

of these unpled matters has been tested under the rigors of Rules 9(b) and 12(b)(6), let alone

found to have met those requirements, nor were they filed under seal as required by the FCA.

*See* 31 U.S.C. § 3730(b).

Because defendants were not on notice that the billeting allegation was in the case,

defendants did not take discovery on the issue.  Defendants do not know the basis for or

substance of relators' allegations, and so cannot defend against them at this time.  As such, if

relators are permitted to pursue the billeting allegation, defendants request a continuance of the

trial date to allow them adequate time to conduct discovery, including seeking discovery from

the State Department.  Based on the near three months that it took to obtain the needed discovery

from the State Department on the other issues in this case, defendants request a continuance until

early September for the start of trial.

## ARGUMENT

The SAC sets the parameters of the issues in this case.  Under the Federal Rules, a

complaint puts a defendant on notice about the scope of a dispute.  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007) (stating that the purpose of Rule 8's pleading requirements is "to 'give

the defendant fair notice of what the . . . claim is and the grounds upon which it rests'") (quoting

*Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

The discovery process is to *narrow and focus* – not broaden – the disputed issues

identified in the complaint.  In *Conley*, the Supreme Court observed that the Federal Rules

regarding discovery are in place to "disclose *more precisely* the basis of both claim and defense

and *to define more narrowly* the disputed facts and issues."  *Conley*, 355 U.S. at 47-48 (emphasis

added); *see also Hickman v. Taylor*, 329 U.S. 495, 500-01 (1947) (the purpose of discovery is

"to narrow and clarify the basic issues between the parties. . . . "); *United States v. Proctor &*

*Gamble Co.*, 356 U.S. 677, 682 (1958) (the discovery process is designed to make a trial "less a

game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the

fullest practicable extent").

It is well established that a plaintiff's claims must be limited to the allegations in his or

her complaint to avoid prejudicing defendants.  *See, e.g.*, *Owens,* 612 F.3d at 731; *United States*

*ex rel. Schuhardt v. Washington Univ.*, 361 F. Supp. 2d 992, 995 (E.D. Mo. 2003), *rev'd on other*

*grounds*, 390 F.3d 563 (8th Cir. 2004).  In *Schuhardt*, employees of a state university hospital

brought an action under the False Claims Act alleging that the defendant falsely and fraudulently

billed Medicare and other government healthcare entities.  In response to the defendant's motion

for summary judgment, the relators attempted to assert new allegations about the hospital's

failure to use proper coding levels for consultations.  *Id.* at 1006.  The district court noted:

"Plaintiffs did not make this allegation in their complaint, but they claim that they were 'made

aware' of this practice through review of the medical files turned over in discovery."  *Id*.  The

court held it would "not allow plaintiffs to use discovery to make new allegations against

defendant.  As such, these allegations will be disregarded."  *Id*.

Similarly, in *Seale v. Miller*, 698 F. Supp. 883, 903 (N.D. Ga. 1988), the court granted

summary judgment for the defendant where the plaintiff's response to a summary judgment

motion raised allegations of fraudulent conduct not raised in the amended complaint.  The *Seale*

court stated:  "Plaintiff has not properly moved the court to amend his complaint to state this new

theory and the court is not inclined to overlook plaintiff's procedural violation given the obvious

prejudice to the defendants of having to respond to new allegations at this stage in the case." 698

F. Supp. at 904.

It is therefore axiomatic that the relators are precluded from seeking recovery on any

claims or allegations beyond those identified in their second amended complaint.  The allegation

about billeting stands on no greater footing than relators' allegations about bribes, third country

nationals, and other issues the Court excluded from the case.  For example, relators alleged false

expenditures for cost reimbursement generally but the Court did not allow them to add specific

claims such as alleged bribes.  The allegations concerning billeting are no different, and they

should not remain in the case.

### A. Relators' and relators' counsel's statements have made it clear that their *only* allegation regarding false musters is that USTC billed "for people who weren't there."

From the filing of the complaint through last Friday's summary judgment hearing, the

record overwhelmingly demonstrates that allegations of false billeting were not part of the false

musters claim.  The indisputable facts that follow are but a glimpse into that reality.

First, relators have *never* asserted – in the SAC, their statements of material disclosure,

deposition testimony, declarations, or otherwise – that the SAC includes the billeting allegation

or that they have any knowledge of that allegation.  Rather, their attorney merely *assented* to a

statement by the Court that the language in the complaint is *broad enough* to encompass such a

billeting allegation.  Ex. B (May 20, 2011 Hr'g Tr.) at 87:23-88:1 (THE COURT:  Your response

is that that language is sufficiently broad. [Relator's counsel]:  Your Honor, my response is that

language is sufficiently broad.").  Relators' counsel told the Court unequivocally that the *relators*

were aware of this issue at the time they filed their SAC.  *Id.* at 88:13-15.  But counsel's next

statement suggests a more nuanced interpretation  that perhaps counsel knew about the issue, but

relators did not:  "Yes, *we* knew that.  But the time that Brad and Melan were there, the falsity of

the labor designation didn't have the same financial impact that they [sic] did after they left."  *Id*.

at 88:25-89:3 (emphasis added).  Notably, there is not one statement in either the SAC or the

relators' statements of material fact which articulates false *billeting* as a basis for the false

musters allegations – not one.  Nor has either of the relators testified by deposition or declaration

as to false billeting.  Relators' counsel's own statements show that the claim is not and was not

intended to be in the SAC.  There is not one shred of evidence that either relator had knowledge

of alleged false billeting.[5]

    Next, in relators' opposition to defendants' motion to dismiss for failure to plead fraud

with particularity, filed on June 11, 2010, relators were unequivocal in representing to the Court

that their musters allegation only concerned whether personnel were present or not and nothing

more:

> The terms of the WPPS contract contemplated that Defendants would be
> paid on a monthly basis at a "cost plus" rate.  Defendants submitted
> "musters" that demonstrated **how many** employees were in either Iraq or
> Afghanistan performing security services.

Dkt. No. 24 at 4.  At the July 1, 2010, hearing on defendants' motion to dismiss, it was similarly

clear that relators' "musters" allegation relates solely to the issue of billing for personnel who

were not in-country.  Indeed, this was the understanding of defendants, relators and this Court:

> [Defendants' counsel]:  . . . On the personnel musters, although the body
> of the amended complaint alleges that the personnel musters were false,
> generally stated, personnel musters were false.  When you look at the
> exhibit –

---

[5] Relators' counsel *herself* may have "known" of alleged false billeting from other sources --
such as her recently disclosed witnesses, her clients Messrs. Shepherd and Beauchamp – who
were not in contact with Ms. Burke until after the filing of relators' complaint.

> The Court: So you would argue that she would have to – she being
> [relators' counsel] – would have to allege that with respect to a specified
> muster, **here are the people who weren't there**, and that this is why the
> muster was false.
>
> . . . .
> The Court: Tell me again what the WPPS contract scheme was.
>
> [Relators' counsel]: There are two different schemes. **And it's very
> straightforward. It's _time_ and it's travel reimbursement**. So, it's
> almost akin to a law firm billing its services. You bill for time, you get
> paid for it, and then you get reimbursed for travel when you actually pay
> the nonrelated third party to travel.
>
> . . . .
> On the personnel side, what we said is they – you know, they phonied up
> their musters. **They claimed money _for people who weren't there_**.

Ex. A (July 1, 2010 Hr'g Tr.) at 12-13, 30, 32 (emphasis added).[6]  Nowhere in the record on the

motion to dismiss is there any mention of, or reference to, the issue of the accuracy of the job

categories in which personnel were listed and billed on the musters.

　　Discovery proceeded much the same.  Relators' counsel told the Court at last week's

hearing that their conduct of discovery was sufficient to put defendants on notice that relators

would seek to impose liability based on billeting, _see_ Ex. B (May 20, 2011 Hr'g Tr.) at 88:1-6,

but that is not the case.  The only deposition questions posed to witnesses about IC qualifications

for work concerned relators' worthless services claim, which has since been dismissed.  Nor do

relators' hundreds of requests for production, and dozens of interrogatories and requests for

admission focus on billeting.[7]  And the subpoena relators served on the State Department on

---

[6]  The Court similarly characterized the musters allegation as relating solely to whether they
accurately reported the number of personnel in service on a given day.  Ex. H (Aug. 27, 2010
Hr'g Tr.) at 26-27 ("The Court: … Is it enough – I think you argued it's enough for this report to
say that musters (ph.) were wrong.  That is to say that they reported people as being in country,
when they were, in fact, in travel status or otherwise not physically present.")

[7]  In addition to failing to serve discovery regarding the billeting allegation, relators did not press
defendants to produce personnel files that might have had tangential relevance.  Relators issued
three requests seeking documents related to the qualifications and training of personnel

(continued…)

March 2 does not even hint that relators sought documents bearing upon improper billeting.  Ex.

J (Rels.' Subpoena to DoS).

Moreover, relators' counsel's statements to the Court at various discovery hearings have

solidified time and again the sole nature of the SAC's false musters claim:

> [Relators' counsel]:   [W]hat we do know is that from the very beginning of this case what we've asked for are the contemporaneous business records that show when the independent contractors are in country.  That is the, **that is the gravamen of the fraud here, were these people in country when the defendants put them on the musters and billed the United States for them being in country**.

Ex. C (Feb. 18, 2011 Hr'g Tr.) at 14:14-20 (emphasis added).

> [Relators' counsel]:   What we have put together with help from our experts is a set of discrepancies in contemporaneous documents that establish that the documents submitted to the United States are false.  **That they do not reflect accurate information about the cost of travel and about the date of travel**.
> . . .
> This case, this case has two components of the fraud on the WPPS.  One is the actual fraud as far as getting too much money for travel, but the other has to do with the labor.  **They made their money billing for men in country, boots on the ground.  It is critically important for that muster fraud piece to be able for us to establish that, okay, when they said Joe Smith was in Iraq, he actually was back in the United States**.

Ex. D (Mar. 18, 2011 Hr'g Tr.) at 7:5-10, 12:19-13:1 (emphasis added).

> [Relators' counsel]:   Essentially this is a bit of a Where's Waldo case and we're trying to collect up the contemporaneous documentation that will prove Joe Smith was in country.
> . . .

---

(continued…)

deploying on both the Katrina and WPPS II contracts.  Defendants responded that they would not produce any documents for the WPPS II contract because of their interpretation that these requests were not relevant in light of the Court's ruling dismissing the WPPS II worthless services claim.  Ex. I (Defs.' Feb. 10, 2011 Rule 34 Responses).  Relators did not object or move to compel.  Nor did relators issue any discovery concerning their two new witnesses Beauchamp and Shepherd.

> [Relators' counsel]:   **This is a case about whether or not the dates that are reflected on the musters to the State Department are accurate. And so, do those dates on the musters accurately reflect when men were in country?**  There is different ways to challenge those dates.  And the primary way that we have been challenging them is through travel records because the travel records prove, okay, it's physically impossible for you to be in country.

Ex. E (Apr. 1, 2011 Hr'g Tr.) at 11:18-21; 41:24-42:6 (emphasis added).

Finally, the summary judgment briefing itself belies relators' assertions at the hearing last week.  Had the billeting issue been in the case before May 20, relators would have certainly made express mention of it in their motion for summary judgment.[8]  *See, e.g.*, Dkt. No. 347 (Rels.' Reply) at 6-8 (section titled "Company Overbilling for Labor Costs"), at 19 (concluding that "summary adjudication of liability is merited by the evidence" and trial is needed on WPPS II only to "adjudicate the measure of damages").  There was no such mention.  Rather, the argument in relators' motion for summary judgment concerning false musters focused solely on whether ICs were, in fact, "boots on the ground" when billed.  *E.g.*, Dkt. No. 322 (Rels.' Mem.) ¶ 31.  Relators' reply brief was no different.  Despite the inclusion of a section entitled "Company Overbilling for Labor Costs," there is not one mention of billeting.  Dkt. No. 347 (Rels.' Reply) at 6-8.

Indeed, the only paper in which relators raise the topic at all is their opposition to defendants' summary judgment motion.  But even here, the cites do not indicate that billeting is part of the false musters claim.  In the introduction, relators argue that USTC had a pattern of "overbilling labor charges by one or two days for each IC entering and leaving Iraq and Afghanistan" – they do not mention billeting, nor do they do so in the argument section of the

---

[8] Relators' motion encompassed all WPPS II issues except those concerning the travel agency called Carlson Wagonlit, which relators withdrew in their summary judgment memorandum. Dkt. No. 329 (Rels.' Opp'n) at 17 n.19.

opposition.  Dkt. No. 329 (Rels.' Opp'n) at 2.  The only mention is to rehash the declarations of

Messrs. Shepherd and Beauchamp that relators attached to their opposition, and both the

declarations and relators' statements are vague as to whether they are addressing "boots on the

ground" or billeting issues.  *Id*. at 16-18.  But these declarations appended to relators' opposition

do not establish that the SAC's false muster claim includes alleged billeting fraud.  Nor was

there any relevant allegation or evidence in the case until the filing of these declarations –

indeed, relators did not notify defendants of these two witnesses until March 23, 2011, Ex. F

(Mar. 23, 2011 email from Burke to Beizer), and did not make either of them available for

deposition until the Court's recent order.

### B.  Allowing relators to proceed with the billeting issue would thwart the very purpose of Rule 9(b).

If relators' billeting allegation were permitted to proceed, defendants will have been

deprived of the opportunity to move to dismiss these allegations based on Rule 9(b).  The Fourth

Circuit, like every other circuit court that has addressed the issue, has held that a False Claims

Act action constitutes an action in fraud and that complainants alleging FCA violations are

therefore required to meet the "particularity" pleading requirement of Rule 9(b).  *See United*

*States ex rel. Wilson v. Kellogg, Brown and Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008);

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783-84 (4th Cir. 1999).  Failure to

comply with Rule 9(b)'s pleading requirements is "treated as a failure to state a claim under Rule

12(b)(6)" and requires dismissal.  *See Harrison*, 176 F.3d at 783 n.5.

When a plaintiff does not specifically plead the minimum elements of their allegation, it

enables them to learn the complaint's bare essentials through discovery and may needlessly harm

a defendant's goodwill and reputation by bringing a suit that is, at best, missing some of its core

underpinnings, and, at worst, are baseless allegations used to extract settlements.  *This is*

*especially so in cases involving the False Claims Act*, which provides a windfall for the first person to file and permit recovery on behalf of the real victim, the government. *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1313-14 n.24 (11th Cir. 2002) (citation omitted) (emphasis added); *see also Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997) ("As a class of plaintiffs, *qui tam* relators are different in kind than the Government.  They are motivated primarily by prospects of monetary reward rather than the public good.").

This caveat is especially apt here, where the government – the real party in interest – has chosen not to intervene in the litigation.  *See United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 242 n.31 (1st Cir. 2004) ("[T]he government's decision not to intervene in the action also suggested that [the relator's] pleadings of fraud were potentially inadequate.").

**C.  If relators are allowed to proceed with the billeting allegation, a continuance of the trial date is necessary.**

In the event that this Court allows relators to pursue the billeting allegation, defendants respectfully request a continuance of the June 7, 2011, trial date to permit defendants to conduct discovery on this issue.  Examples of the discovery that would be necessary include the following.

First, because neither Ms. Davis nor Mr. Davis identified the billeting issue in their depositions in response to questions about what the musters allegations entailed, at least Ms. Davis would need to be deposed on this topic.

Second, because the State Department advised defendants to narrowly define the scope of the discovery sought from it, and because the billeting issue was not mentioned in any of the complaints or in the depositions of relators, defendants did not request discovery from the State Department on the billeting issue.  In order to prepare for trial, defendants will need to serve

document requests on DoS and take depositions of DoS personnel.  Given that it took two months for the State Department to process the "Touhy" requests that are required before such discovery can be undertaken, defendants anticipate that it will take at least that long again to complete this additional discovery.

Third, relators have acknowledged that they deliberately precluded defendants from deposing Messrs. Beauchamp and Shepherd, both of whom are represented by relators' counsel. The outrageousness of relators' counsel's conduct became even more apparent at 7:30 p.m. on May 24, when three boxes of Mr. Beauchamp's documents purportedly arrived by courier at defendants' counsel's office.  The boxes did not bear the name of an addressee and were not even addressed to Crowell & Moring, so they could not be delivered.  *See* Ex. K (Carter Decl.), ¶ 4.  Mr. Beauchamp's deposition was scheduled for May 25 at 9:00 a.m.  On that date at about 9:30 a.m., the three boxes were delivered, **30 minutes after Mr. Beauchamp's deposition had started**.  Upon review, it became evident that Mr. Beauchamp had sent most of the documents to relators' counsel during the first week of March, 2011; some were sent as early as mid-February. *See id.* (Carter Decl.) ¶ 10.  On March 15, defendants had requested production of all documents relators' counsel received from ICs.  Ex. L (Defs.' Request for Production) ¶ 1.  Yet relators' counsel did not produce the documents for over two months.  Defendants can only assume she did not produce them because the billeting issue was not in the case.  Defendants have still not been able to review these documents, because relators' counsel (also Mr. Beauchamp's counsel) sent an email on May 25th at 2:58 p.m. stating that she had inadvertently produced the wrong set of documents; the three boxes likely contained some privileged documents; she wanted the documents returned; and that she would produce a different set.  Ex. M (May 25, 2011 Burke email to Hammond, et al.).  The author of the second declaration cited by relators' counsel as

relating to billeting, Mr. Shepherd, has not yet been deposed, nor have defendants received any of Mr. Shepherd's documents.

Defendants need time to conduct even the most basic discovery related to the billeting issue. They will be severely prejudiced if they are compelled to go to trial having been deprived of that opportunity.

## CONCLUSION

Relators' eagerness to adopt the Court's suggestion that the language in the SAC is broad enough to encompass false billeting allegations exemplifies relators' attempts throughout this case to recast and reinvent their allegations. The record, however, supported mainly by relators' counsel's own statements, shows that relators made a conscious decision *not* to include billeting allegations in the SAC. As counsel repeatedly said, the case is about "time and travel." Defendants should not be compelled to mount a defense on the eve of trial to allegations that are new to the case. *See Owens,* 612 F.3d at 731. This Court should therefore dismiss any claim relating to false billing based on personnel positions on musters just as it did other unpled claims raised in relators' summary judgment motion. In the event that the Court orders the parties to proceed on the billeting claims, defendants request a continuance so as to avoid the extreme prejudice they will suffer if trial proceeds on June 7th.

Dated: May 26, 2011                          Respectfully submitted,


                                    _____/s/ David O'Brien_____
                                    David W. O'Brien (VSB # 14924)
                                    Richard L. Beizer (VSB # 02646)

Andy Liu (Admitted *pro hac vice*)
Brian T. McLaughlin (VSB # 71258)
Jody Goodman (Admitted *pro hac vice*)
Elizabeth Carter (Admitted *pro hac vice*)

*Counsel for all defendants*

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
P:  202-624-2500
F:  202-628-5116
E:  dobrien@crowell.com
E:  rbeizer@crowell.com
E:  aliu@crowell.com
E:  bmclaughlin@crowell.com
E:  jgoodman@crowell.com
E:  ecarter@crowell.com

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 26th day of May, 2011, the foregoing Memorandum in

Support of Defendants' Emergency Motion for Reconsideration of the Court's May 20, 2011,

Order or, in the Alternative, for a Continuance of the June 7, 2011 Trial Date was filed with the

Court using the CM/ECF system which will send notification to the following:

Susan L. Burke, Esq.
sburke@burkepllc.com
Burke PLLC
1000 Potomac Street, NW
Suite 150
Washington, DC 20007
Telephone:  202-232-5504
Facsimile:  202-232-5513

Joseph F. Rice, Esq.
Frederick C. Baker, Esq.
fbaker@motleyrice.com
MOTLEY RICE, LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464

Monika Moore, Esq.
monika.moore@usdoj.gov
United States Attorney's Office
2100 Jamieson Ave
Alexandria, VA 22314


                                         /s/ David W. O'Brien
                                         David W. O'Brien