IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division



UNITED STATES OF AMERICA ex rel. )
MELAN DAVIS and BRAD DAVIS, )
      Plaintiffs, )
       )
      v. )    Case No. 1:08cv1244
       )
ERIK PRINCE, et al., )
      Defendants. )

## MEMORANDUM OPINION

In this False Claims Act ("FCA")[1] action, relators allege that defendants made false claims and statements while performing two government contracts: (1) a Federal Protective Service ("FPS")[2] contract to provide armed guard services in the aftermath of Hurricane Katrina ("Katrina contract"); and (2) a Department of State contract to provide security services in Iraq and Afghanistan ("WPPS II contract"). After a contentious and far-reaching discovery period, defendants moved for summary judgment on all claims in the second amended complaint ("SAC").[3] Defendants' motion for summary judgment was granted in part and denied in part with respect to the claims relating to the WPPS II contract.[4] It was granted in full with respect to

---

[1] 31 U.S.C. § 3729 et seq.

[2] FPS is a federal law enforcement agency that provides integrated security and law enforcement services to federally owned and leased buildings, facilities, properties and other assets. It is a component of the National Protection and Programs Directorate within the Department of Homeland Security. See http://www.dhs.gov.

[3] The relators filed a cross-motion for summary judgment on some of their claims relating to the WPPS II contract. That motion was denied. United States ex rel. Davis v. Prince, No. 1:08cv1244 (E.D. Va. May 20, 2011) (Order) (Doc. No. 366).

[4] See United States ex rel. Davis v. Prince, No. 1:08cv1244 (E.D. Va. May 20, 2011) (Order) (Doc. No. 365); United States ex rel. Davis v. Prince, No. 1:08cv1244 (E.D. Va. June 13, 2011) (Order) (Doc. No. 443); United States ex rel. Davis v. Prince, No. 1:08cv1244 (E.D. Va. June 23, 2011) (Order) (Doc. No. 457).

the claims relating to the Katrina contract.[5] This Memorandum Opinion memorializes the earlier bench ruling granting summary judgment on the claims relating to the Katrina contract.[6]

I.[7]

The named defendants in this FCA suit are five corporate entities and one individual. The five corporate entities are Blackwater Security Consulting, LLC ("BSC"), Xe Services LLC ("Xe Services"), U.S. Training Center, Inc. ("USTC"), Greystone Limited ("Greystone"), and The Prince Group LLC ("Prince Group"). The only individual defendant is Erik Prince, the sole owner of the entity defendants at the time of the events giving rise to this suit.

In the aftermath of Hurricane Katrina, FPS awarded BSC a contract to provide armed guard services at disaster relief sites in Louisiana. The original contract, effective September 8, 2005, required BSC to provide four vehicles and fourteen armed guards for thirty days at a fixed price of $409,000, and an additional quantity of armed guard services at a unit cost of $950 per day. A contract modification, effective June 1, 2006, reduced the unit cost to $750 per day. Other than fuel costs, the Katrina contract did not permit BSC to obtain reimbursement for any of its costs in administering the Katrina contract. The Katrina contract ended on November 30, 2006.

Relators, Brad and Melan Davis, are a married couple who worked as independent contractors on the Katrina contract. Mr. Davis worked on the Katrina contract in a number of

---

[5] See United States ex rel. Davis v. Prince, No. 1:08cv1244 (E.D. Va. May 20, 2011) (Order) (Doc. No. 365).

[6] To the extent there is any conflict between remarks from the bench at the May 20, 2011 hearing and this Memorandum Opinion, the latter controls.

[7] The facts recited herein are derived from the pleadings and the record taken as a whole, and are not materially disputed except where specifically noted.

different capacities from approximately October 2005 to April 2006. Initially, Mr. Davis served as a team leader for a guard site in Texas. After the Texas site was handed over to another company, Mr. Davis worked as an assistant area manager in New Orleans and was later promoted to area manager in Baton Rouge. In his management role, Mr. Davis was responsible for managing the activities of security guards at different posts. Ms. Davis also worked on the Katrina contract, serving as a billing clerk for approximately three months from January to March 2006.

During their time working on the Katrina contract, relators allege that they observed substantial billing fraud by BSC.[8] Specifically, relators allege that BSC engaged in three fraudulent schemes:

> First, Blackwater inflated the services being provided to the Department of Homeland Security. Blackwater repeatedly and routinely falsified GSA 139 forms, which are the forms that Blackwater was directed to use to record the hours worked by its employees. Blackwater permitted employees to "clock in" for

---

[8] Relators allege that three of the named entity defendants—BSC, Xe Services, and USTC—are liable for submitting false claims on the Katrina contract. *See* SAC ¶¶ 13, 15-23. Yet, it is undisputed that BSC was the only corporate entity that was a party to the Katrina contract, and relators have not adduced any evidence showing that the other entities either presented or caused to be presented false claims or statements to FPS. *See, e.g., United States ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah*, 472 F.3d 702, 714-15 (10th Cir. 2006) (discussing causation requirement). Moreover, although relators alleged in the SAC that Prince ran the corporate defendants as a single company, they have completely failed to brief this issue at the summary judgment stage. Relators submitted briefs totaling over one hundred pages, but they did not cite a single case setting forth the standard for piercing the corporate veil, nor did they explain how the record evidence satisfies that standard. *See* Local Rule 7(F)(1) ("All motions . . . shall be accompanied by a written brief setting forth a concise statement of the facts and supporting reasons, along with a citation of the authorities upon which the movant relies."). In any event, the record evidence cited by relators does not appear to justify holding any of the named defendants liable for BSC's alleged billing fraud on the Katrina contract on a veil piercing or alter ego theory. *See, e.g., United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 60-61 (D.D.C. 2007) (refusing to hold parent liable for FCA violations allegedly committed by its indirect subsidiary on a veil piercing theory). Thus, this Memorandum Opinion refers solely to BSC.

|||their fellow employees, and falsified records to show that employees were working when they were not. Blackwater knowingly and intentionally prepared and maintained falsified GSA 139 forms, and knowingly and intentionally submitted false invoices reflecting these falsified GSA 139 forms on a monthly basis to the Department of Homeland Security.

SAC ¶ 19.

>Second, Blackwater's claims to the Department of Homeland Security incorporated false accounting records for cost expenditures, which were used to justify as reasonable a payment rate of $950 per day. Blackwater knowingly and intentionally paid Blackwater employees for expenses not actually incurred, and then documented those expenses as costs supporting the reasonableness of the monthly claims submitted to the United States. Blackwater also knowingly paid vendors double the amounts they were actually owed, and then documented those expenses as costs supporting the reasonableness of the monthly claims submitted to the Department of Homeland Security.

SAC ¶ 20.

>Third, Blackwater willfully and intentionally billed for worthless services. The contract required that Blackwater management manage personnel, monitor the distribution of weapons and ensure that the company did not give weapons to felons or persons disqualified from using weapons by the Lautenberg Act, which prohibits those involved in domestic abuse from obtaining weapons. Blackwater management utterly failed to perform the requisite managerial services. As an example, Blackwater billed the Department of Homeland Security for services provided by Abe Latelle and George Kelly, yet neither men [sic] fulfilled their managerial responsibilities in any way. Had the Department of Homeland Security been aware of the deficient nature of the managerial services being provided, it would not have paid for the worthless services.

SAC ¶ 21.

Relators filed this FCA suit on December 1, 2008, alleging that defendants are liable under the FCA, 31 U.S.C. §§ 3729(a)(1), (a)(2), (a)(7), for making false claims and statements on the Katrina contract and the WPPS II contract. Pursuant to § 3730(b)(2), relators filed their complaint under seal and served the government with a copy of the complaint and written

disclosure statements. After receiving multiple extensions of the 60-day intervention deadline, the government declined to intervene on January 29, 2010. Shortly thereafter, the complaint was unsealed and properly served on defendants.

Relators filed a first amended complaint ("FAC") as of right on April 14, 2010. In response, defendants moved to dismiss the FAC for failure to state a claim upon which relief may be granted and failure to plead fraud with particularity. After defendants' motion to dismiss was granted in part,[9] relators were permitted to file an SAC.[10] Thereafter, defendants moved to dismiss the SAC for lack of subject matter jurisdiction, arguing that relators' allegations were barred by the public disclosure bar, § 3730(e)(4), because their fraud allegations had been publicly disclosed and relators were not an "original source" of the information underlying their allegations. This motion was denied with respect to the alleged fraud on the Katrina contract.[11]

Now that the discovery period has ended, defendants have moved for summary judgment on the allegations relating to the Katrina contract.[12] In their opening brief, defendants provided a list of undisputed facts relating to the Katrina contract, and in their argument section, they explained why summary judgment is appropriate for each of the three allegations relating to the Katrina contract. In their opposition brief, relators provided minimal, if any, evidence to support

---

[9] See United States ex rel. Davis v. Prince, No. 1:08cv1244, 2010 WL 2679761 (E.D. Va. July 2, 2010) (Order).

[10] See United States ex rel. Davis v. Prince, No. 1:08cv1244 (E.D. Va. July 22, 2010) (Order).

[11] See United States ex rel. Davis v. Prince, 753 F. Supp. 2d 569, 584-85 (E.D. Va. 2011).

[12] As stated above, relators and defendants filed cross-motions for summary judgment on the claims relating to the WPPS II contract. Those motions have already been addressed in four separate Orders. See United States ex rel. Davis v. Prince, No. 1:08cv1244 (E.D. Va. May 20, 2011) (Order) (Doc. No. 365); United States ex rel. Davis v. Prince, No. 1:08cv1244 (E.D. Va. May 20, 2011) (Order) (Doc. No. 366); United States ex rel. Davis v. Prince, No. 1:08cv1244 (E.D. Va. June 13, 2011) (Order) (Doc. No. 443); United States ex rel. Davis v. Prince, No. 1:08cv1244 (E.D. Va. June 23, 2011) (Order) (Doc. No. 457).

their allegations that BSC: (i) submitted false and inflated GSA 139 time sheets; (ii) used false accounting records for cost expenditures; and (iii) utterly failed to manage personnel, monitor the distribution of weapons, and ensure that weapons were not given to felons or Lautenberg Act violators. Instead, relators devoted a significant portion of their opposition brief to asserting a new allegation of fraud. Specifically, relators alleged for the first time in their opposition brief that BSC falsely certified that its security guards met all the requirements listed in the Katrina contract, and they argued that summary judgment should not be granted on this new allegation.

The parties had ample opportunity to brief and argue these issues prior to the May 20, 2011 bench ruling. The page limit for the summary judgment briefs was extended to fifty pages so that the parties could address each of the allegations in the SAC and cite all pertinent evidence creating a genuine issue of fact regarding those allegations.[13] Moreover, during oral argument, the parties were given yet another opportunity to cite or specify the record evidence creating a genuine issue of fact for trial. Given the length of the briefs and the size of the record, it is reasonable, as settled authority makes clear, to rely on the parties to specify all pertinent evidence. It is not the Court's responsibility to undertake the herculean task of reviewing a voluminous record to find evidence to support each party's position.[14] Given that each party had

---

[13] *See United States ex rel. Davis v. Prince*, No. 1:08cv1244 (E.D. Va. Apr. 15, 2011) (Order). Because the parties filed cross-motions for summary judgment, each party submitted over one hundred pages of briefing at the summary judgment stage.

[14] Indeed, it is well-settled that it is not the role or responsibility of the district court to parse the record to make a party's case for him. *See United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) ("[S]ummary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact, and it was not the district court's job to sift through the record and make [the party's] case for him."); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.") (quoting *Skotak v. Tenneco Resins, Inc.*,

ample opportunity to brief and argue their respective positions, the motion was ripe for resolution at the May 20, 2011 hearing, and this Memorandum Opinion elucidates the reasons for the May 20, 2011 bench ruling.

## II.

The summary judgment standard is too well-settled to require elaboration here. In essence, summary judgment is appropriate under Rule 56, Fed. R. Civ. P., only where, on the basis of undisputed facts, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Importantly, to defeat summary judgment, the non-moving party may not rest upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine issue for trial. *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Thus, the party with the burden of proof on an issue cannot prevail at summary judgment on that issue unless that party adduces evidence that would be sufficient, if believed, to carry the burden of proof on that issue at trial. *See Celotex*, 477 U.S. at 322.

## III.

The FCA creates liability for any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). The FCA also allows suit against anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." *Id.* § 3729(a)(2).[15]

---

953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)); *see also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").
[15] Congress amended the substantive liability provisions of the FCA on May 20, 2009. *See* Fraud Enforcement Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, sec. 4, 123 Stat. 1617, 1621 (2009). Although these amendments generally apply prospectively, there is an important exception. Specifically, FERA provides that the amended version of § 3729(a)(2) (renumbered as § 3729(a)(1)(B)) "shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act . . . that are pending on or after that date." *Id.* § 4(f)(1). Courts are split on

Finally, the FCA renders liable for damages any person who "knowingly makes uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay . . . money . . . to the Government." *Id.* § 3729(a)(7).

The FCA specifies that a person acts "knowingly" with respect to information if that person "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b). No proof of specific intent to defraud is required to establish liability under the FCA. *Id.* Given this statutory definition, it is clear that the FCA is not intended to "punish honest mistakes or incorrect claims submitted through mere negligence." *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010). Moreover, it is well-settled in the Fourth Circuit that "the government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation." *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002).

Liability under the FCA is also subject to the judicially-imposed requirement that the false claim or statement be material. In the Fourth Circuit, a false statement is material if it "has a natural tendency to influence agency action or is capable of influencing agency action." *United States ex rel. Berge v. Bd. of Trustees of Univ. of Ala.*, 104 F.3d 1453, 1459 (4th Cir. 1997) (internal quotations and citations omitted). Moreover, the Fourth Circuit has held that "[t]he question of materiality is a mixed question of law and fact for the court to decide." *United States*

---

whether the amended version of the statute applies when a *case* is pending on or after June 7, 2008, or whether it applies only when the false *claims* at issue in the litigation were pending on or after June 7, 2008. *Compare United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 n.1 (5th Cir. 2010) *with Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327 n.3 (11th Cir. 2009). Here, it is unnecessary to reach or decide this issue here because the result on the issues presented here would be the same regardless of which version of the statute applies.

*ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 914 (4th Cir. 2003) (*Harrison II*).

Thus, to avoid summary judgment on the allegations relating to the Katrina contract, relators must create, with respect to each of the three fraudulent schemes alleged in the SAC, a genuine issue of fact showing: (1) that BSC made a false statement or engaged in a fraudulent course of conduct; (2) that such statement or conduct was made or carried out with the requisite scienter; (3) that the statement or conduct was material; and (4) that the statement or conduct caused the government to pay out money or to forfeit money due (i.e., that involved a claim). *See Owens*, 612 F.3d at 729; *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999) (*Harrison I*).

### A.

Relators allege that BSC "knowingly and intentionally prepared and maintained falsified GSA 139 forms, and knowingly and intentionally submitted false invoices reflecting these falsified GSA 139 forms on a monthly basis to the Department of Homeland Security." SAC ¶ 19. At the summary judgment stage, relators support this allegation by citing a preliminary expert report. *See* Pl. Ex. E (Oliver Report). Yet, the preliminary expert report was drafted *before* document production was completed, and the expert who prepared the report simply concludes that he is unable to determine whether the labor billings on the Katrina contract were accurate because he does not have all the pertinent documents:

> Given the lack of documentation received for billings and all supporting materials that cover the base and extension periods of the Contract, I am unable to conclude on the appropriateness, accuracy or contract compliant amounts for billings.

*Id.* Clearly, an expert's inability to conclude whether false claims were submitted does not create a genuine issue of fact over whether false claims were submitted.

Relators also cite portions of Mr. Davis's deposition testimony. These citations reveal that Mr. Davis testified that there was some confusion, at one point, over how, and by whom, GSA 139 time sheets should be properly completed.[16] Mr. Davis also testified that five security guards were terminated because he caught them lying on their GSA 139 time sheets.[17] Finally, Mr. Davis testified that other security guards, whose names he could not recall, were also caught lying on GSA 139 time sheets, and some of these unnamed guards were not terminated.[18] Yet, this testimony does not create a genuine issue of fact over whether BSC knowingly submitted false GSA 139 time sheets; if anything, it demonstrates that BSC's managers supervised their security guards and caught guards who lied on their GSA 139 time sheets.

In any event, relators conceded at oral argument that the record evidence is insufficient to create a genuine issue of fact over whether BSC knowingly submitted false GSA 139 time sheets. Specifically, at oral argument, the Court explained to relators that the evidence cited in their brief was insufficient to create a genuine issue of fact for trial.

> **The Court:** So with respect to the GSA 139 forms, there simply, in my view at this point, is no record evidence cited in the briefs of the relators establishing that defendants either knew that the GSA 139 sheets were false or acted in reckless disregard as to their falsity. As I said, the expert report certainly falls far short of showing that.
>
> . . .
>
> **The Court:** So in my view at the moment, Ms. Burke, you're on the short end of a motion for summary judgment on the Katrina contract. Not yet on WPPS 2, but on Katrina. Yes.

---

[16] B. Davis Tr. at 430-31.

[17] B. Davis Tr. at 286-87.

[18] B. Davis Tr. at 458-59.

May 20, 2011 Hearing Tr. at 95:11-16, 100:25-101:3. In response, relators did not argue that the Court's view of the cited evidence was inaccurate, nor did they direct the Court's attention to additional evidence in the voluminous record that was not cited in their brief. Instead, relators simply conceded that the record evidence is insufficient to avoid summary judgment, and they directed their arguments solely at preserving the worthless services allegation:

> **Attorney Burke:** Yes, your honor. *[W]e accept that we have not met our burden . . . in terms of the falsification of the GSAs. Your Honor, I do believe, though, that we have submitted sufficient record evidence to go forward on the worthless services.*

May 20, 2011 Hearing Tr. at 101:5-8 (emphasis added). Thus, BSC is entitled to summary judgment on all claims relating to the allegation that it knowingly submitted false GSA 139 time sheets to FPS.

### B.

Relators allege that "Blackwater's claims to the Department of Homeland Security incorporated false accounting records for cost expenditures, which were used to justify as reasonable a payment rate of $950 per day." The record evidence shows that BSC did not justify the payment rate for security guards by submitting any accounting records. *See* Def. Ex. 8 (Flatley Decl.) ¶ 8 ("Blackwater did not justify [the man-day rate] by the submission of any accounting records, whether true or false."). Relators do not dispute this evidence, nor do they provide any argument as to why this allegation should proceed to trial. Indeed, relators do not mention this allegation anywhere in their brief opposing BSC's summary judgment motion. Thus, BSC is entitled to summary judgment on all claims relating to this allegation.[19]

---

[19] In her Statement of Material Disclosure, Ms. Davis alleged that BSC inflated the amount of expenses incurred on the Katrina contract and billed FPS for the inflated amount. *See* M. Davis SOMD ¶¶ 6-12. The record evidence shows that BSC did not bill FPS for any cost reimbursements. *See* Def. Ex. 16 (Quackenbush Decl.) ¶ 3 ("Blackwater did not submit any invoices for any cost reimbursable items under the contract. The government did not pay

## C.

Relators allege that BSC billed FPS for worthless managerial services. Specifically, relators allege that the Katrina contract required BSC to manage personnel, monitor the distribution of weapons, and ensure that weapons were not given to felons or persons disqualified from using weapons by the Lautenberg Act.[20] According to relators, BSC "utterly failed" to perform these services. *Id.* By way of example, relators allege that BSC billed for the services of two managers, Abe Latelle and George Kelly, who failed to fulfill their managerial responsibilities in any way. *Id.*

BSC does not dispute that the FCA prohibits government contractors from submitting claims for services that are either not provided or that are provided in such a deficient manner as to be practically worthless.[21] Yet, BSC argues that it cannot be held liable for billing FPS for worthless managerial services because it did not, in fact, bill FPS for those services. BSC's argument is premised entirely on the terms on the Katrina contract. Specifically, BSC argues that it did not bill FPS for managerial services because it was not permitted to bill for those

---

Blackwater for any cost reimbursable items."). Relators do not dispute this evidence, and at oral argument, they conceded that this allegation was not supported by the record evidence. *See* May 20, 2011 Hearing Tr. at 101:6-7 ("[W]e accept that we have not met our burden in terms of the reimbursement . . . .").

[20] The Lautenberg Act prohibits individuals who have been convicted of misdemeanor domestic violence crimes from possessing firearms. *See* 18 U.S.C. § 922(g)(9).

[21] *See United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) ("In the paradigmatic case, a claim is false because it involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.") (internal quotations and citations omitted); *Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir. 2001) ("In a worthless services claim, the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all."); *In re Genesis Health Care Ventures, Inc.*, 112 F. App'x 140, 143 (3d Cir. 2001) ("Case law in the area of 'worthless services' under the FCA addresses instances in which either services are literally not provided or the service is so substandard as to be tantamount to no service at all.").

services under the Katrina contract. In this regard, BSC emphasizes that the Katrina contract permitted BSC to bill FPS for only three items: (1) four vehicles and fourteen armed guards at a fixed price of $409,000; (2) additional man days of armed guard services at a unit cost of $950 per day (which was later reduced to $750 per day); and (3) fuel.

This argument is not persuasive because the terms of the Katrina contract are sufficiently broad to allow BSC to bill for personnel who served solely in a managerial capacity. To be sure, BSC is correct that the Katrina contract does not expressly state that BSC can bill FPS for managerial services. Yet, this argument glosses over the fact that the Katrina contract does allow BSC to invoice FPS for "additional man days of armed guard services" and expressly states that "[a] man day consists of a minimum of 12 productive hours of security service *or directly related work in support of the ongoing security operation*." See Def. Ex. 33-1 (Katrina contract) (emphasis added). This definition of "man day" is easily broad enough to cover services performed by personnel who served solely in a managerial capacity, such as area managers, like Mr. Davis, who managed the activities of guards serving at various posts.[22] Thus, BSC cannot win summary judgment by simply claiming that the Katrina contract did not permit BSC to bill for managerial services.

---

[22] Indeed, there is evidence that BSC did bill FPS for the services of personnel who were serving solely in a managerial capacity. For example, during his deposition, Mr. Davis testified that he signed GSA 139 time sheets when he was serving as an assistant area manager in New Orleans and was not providing any guard services. See B. Davis Tr. at 429:15-430:10. Moreover, James Flatley, the program manager for the Katrina contract, submitted a declaration stating that George Kelly, one of the managers identified in the SAC, "served first as an operations manager and later, like Mr. Davis, as a C-1 area manager, which was a promotion." Def. Ex. 8 (Flatley Decl.) ¶ 10. Flatley then states: "When Mr. Kelly served as an operations manager, Blackwater did not charge his time to the Katrina contract, unless he was assigned to the guard pool." *Id.* Read together, these two sentences create an inference that BSC billed FPS for Kelly's services when he served as a C-1 area manager.

Nevertheless, even if BSC billed FPS for managerial services, BSC cannot be held liable under the FCA for failing to manage personnel, monitor the distribution of weapons, and ensure that weapons were not given to felons or Lautenberg Act violators. This is so because the Katrina contract did not require BSC to perform those particular services. To begin with, the Katrina contract did not require BSC to "manage personnel."[23] *See* Def. Ex. 33-1 (Katrina contract). Even if it did, this vague contractual requirement cannot serve as the basis for an FCA claim. *See United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376-78 (4th Cir. 2008) ("An FCA relator cannot base a fraud claim on nothing more than his own interpretation of an imprecise contractual provision.").

Similarly, there is nothing in the Katrina contract that required BSC to "monitor the distribution of weapons."[24] *See* Def. Ex. 33-1 (Katrina contract). This interpretation of the

---

[23] Mr. Davis explained what he meant by "manage personnel" during his deposition:

> Q: Okay. In paragraph 21, you say that the contract required Blackwater management to manage personnel. What did you mean by manage personnel?
>
> A: I think it's pretty self-explanatory. Managing personnel is making sure that they're doing their job, making sure that they're taken care of and making sure that everything is—is going the right way. That's management. You got to be able to take care of things, and you take care of your guys and you take care of the guys that are taking care of the business, and that's what management is.

B. Davis Tr. at 310:22-311:10.

[24] Mr. Davis clarified this allegation in his Statement of Material Disclosure:

> Blackwater failed to maintain any accountability over the weapons purchased for these contracts. The armory issued shotguns, Glocks and M4s. But when a weapon was lost, Blackwater management failed to record that fact.

B. Davis SOMD ¶ 34.

Katrina contract is consistent with FPS's views about what the contract required. Specifically, the FPS contracting officer who awarded the Katrina contract and each of its task orders to BSC submitted a sworn declaration stating:

> The contract did not require Blackwater to monitor the distribution of weapons. The contract did not require Blackwater to provide to the government a list of serial numbers of weapons. The contract did not require Blackwater to report lost weapons. A lost weapon would not prevent Blackwater from invoicing for man days of guard services.

Def. Ex. 16 (Quackenbush Decl.) ¶ 5.

Finally, the Katrina contract did not require BSC to "ensure that the company did not give weapons to felons or persons disqualified from using weapons by the Lautenberg Act." *See* Def. Ex. 33-1 (Katrina contract). Indeed, BSC could not ensure that felons or Lautenberg Act violators were not given weapons unless it performed criminal background checks on its security guards before the guards were assigned to their posts. Yet, the Katrina contract is clear that FPS, and not BSC, was required to perform criminal background checks. *Id.*[25] The record evidence is

---

[25] Brad Davis's deposition testimony reveals that his allegation that BSC failed to ensure that felons and Lautenberg Act violators were not given weapons was based on his speculation that BSC was required to perform criminal background checks:

> Q: Right? What was the company supposed to do to ensure that weapons did not fall into the hands of felons?
>
> A: Well, they're claiming to be doing background checks. They're claiming to be running your fingerprints. However, the background checks and the fingerprints were not conducted until you got to Baton Rouge, and it takes time to get that background check and it takes time to run those fingerprints. So in the meantime, they would give the guy a weapon, they would send them out to a site and three weeks later they find out oh, he's got— he's got domestic violence so he's in violation of the Lautenberg Act, which [sic] he's not allowed to carry a weapon.

. . .

also clear that in light of the emergency situation following Hurricane Katrina, FPS permitted BSC to use security guards before their background checks were completed. *See* Def. Ex. 16 (Quackenbush Decl.) ¶ 6. Thus, FPS was aware that some security guards with disqualifying criminal records might be used at guard sites until FPS could perform a criminal background check and have those guards removed from the contract.

To be sure, the Katrina contract required BSC to provide FPS with information on its security guards (e.g., name and social security number) so that FPS could perform criminal background checks using the National Crime Information Center ("NCIC") database. *See* Def. Ex. 33-1 (Katrina contract). BSC was also obligated to provide FPS with domestic violence forms.[26] *Id.* But the record evidence does not create a genuine issue of fact over whether BSC "utterly failed" to perform these more limited contractual duties. At most, the record evidence

---

> It seems like a lack of effort or a lack of—lack of duty to—putting people on the ground, you're putting a weapon in their hand, you've got to make sure, you've got to be 110 percent sure that that's the right person to be holding a weapon, especially when you're doing something within the continental United States.
>
> . . .
>
> Q: Who was supposed to do the records check, the criminal records check? Was Blackwater supposed to do that or was the government?
>
> A: I would think that Blackwater would be required by contract to make sure that they're furnishing qualified personnel.
>
> Q: But you don't know who was supposed to do the records check, do you?
>
> A: No, I don't.

B. Davis Tr. at 321:10-322:2, 322:12-19, 324:4-12.

[26] It appears that these forms required prospective security guards to swear that they had not been convicted of a domestic violence offense. *See* B. Davis Tr. at 463:17-464:5.

shows that BSC may have submitted some of the forms in a less than timely manner. Although this evidence might support a breach-of-contract claim, it is not sufficient to establish a worthless services fraud claim. *See Mikes*, 274 F.3d at 703.[27] Accordingly, BSC is entitled to summary judgment on all claims relating to the allegations that BSC provided worthless managerial services.

In their opposition brief, relators do not address their allegation that BSC provided worthless managerial services because it failed to manage personnel, monitor the distribution of weapons, or ensure that weapons were not given to felons or Lautenberg Act violators. Instead, relators use almost twenty percent of their fifty page brief (nine pages) to assert a brand new fraud claim. Specifically, relators allege for the first time in their opposition brief that BSC expressly certified that its security guards met all the requirements listed in the Katrina contract. These certifications were allegedly false because: (1) the security guards were not properly trained; (2) at least some of the security guards did not have valid firearms licenses; and (3) BSC was not providing domestic violence forms in a timely fashion, nor was it properly screening security guards for drug use.

There is no dispute that the Fourth Circuit recognizes false certification claims. *See Harrison I*, 176 F.3d at 793.[28] In a recent opinion, the Fourth Circuit stated that:

> A false certification of contract compliance can give rise to liability under the False Claims Act if: "a government contract or program required compliance with certain conditions as a prerequisite to a government benefit, payment, or program; the defendant failed to comply with those conditions; and the

---

[27] It is worth noting that relators provided no evidence to support their allegation that Abe Latelle and George Kelly provided worthless managerial services. *See* cases cited *supra* note 14.

[28] BSC argues that *implied* certification claims are not viable in the Fourth Circuit. *See Harrison I*, 176 F.3d at 787 n.8 (stating that previous case law "makes questionable an implied certification claim in the Fourth Circuit"). Even assuming that the Fourth Circuit recognizes such claims, it does not change the result reached here.

> defendant falsely certified that it had complied with the conditions in order to induce the government benefit."

*United States ex rel. Godfrey v. KBR, Inc.*, 360 F. App'x 407, 411-12 (4th Cir. 2010) (quoting *Harrison I*, 176 F.3d at 786).

Yet, relators cannot rely on their false certification claim to avoid summary judgment because they did not allege this claim in the SAC. *See Owens*, 612 F.3d at 731 ("[I]t is well established that a plaintiff may not raise new claims after discovery has begun without amending his complaint."); *see also Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004))). Relators did not allege in the SAC that the Katrina contract required security guards to have valid firearms licenses, nor did they allege that the Katrina contract required security guards to undergo drug testing.[29] Relators also did not allege that BSC was required to submit domestic violence forms to FPS. Although relators did allege that the Katrina contract had some training requirements, they did not allege what those training requirements actually were. *See* B. Davis SOMD ¶ 35 (alleging only that "Blackwater failed to fulfill the contract requirements for training in Louisiana"). In any event, relators did not allege that BSC knowingly violated any of the contractual provisions at issue. Nor did they allege that compliance with any of these provisions was a prerequisite for payment.[30] Finally, relators did

---

[29] In his Statement of Material Disclosure, Mr. Davis alleged that "Blackwater hired persons without completing any screening in advance." SOMD ¶ 35. Mr. Davis did not allege that the Katrina contract required BSC to test its security guards for drugs.

[30] *See Godfrey*, 360 F. App'x at 412 (holding that an alleged breach of contractual requirements, without regard to a certification requirement, cannot support an FCA claim); *United States ex rel. Herrera v. Danka Office Imaging Co.*, 91 F. App'x 862, 865 (4th Cir. 2004) (rejecting implied false certification claim where contract did not condition payment on certification of compliance with contractual provision); *Harrison I*, 176 F.3d at 793 (holding that relator's implied false

not allege that BSC certified compliance with the contractual provisions at issue. Thus, under well-established Fourth Circuit precedent, relators cannot raise these allegations for the first time at the summary judgment stage.

IV.

Accordingly, defendants are entitled to summary judgment on all claims relating to the Katrina contract.

An appropriate Order has already been issued.[31]

Alexandria, Virginia
July 13, 2011

/s/

T. S. Ellis, III
United States District Judge

---

certification claim "fails on the pleadings because he has never asserted that such implied certifications were in any way related to, let alone prerequisites for, receiving continued funding."); *United States ex rel. Carter v. Halliburton Co.*, No. 1:08cv1162, 2009 WL 2240331, at *13 (E.D. Va. July 23, 2009) (dismissing implied certification claim because "Relator makes no allegations regarding whether the Government's payments to Defendants were conditioned upon a certification of compliance").

[31] *See United States ex rel. Davis v. Prince*, No. 1:08cv1244 (E.D. Va. May 20, 2011) (Order) (Doc. No. 365).