UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____
                                              )
UNITED STATES OF AMERICA ex rel.              )
MELAN DAVIS and BRAD DAVIS,                    )
                              Relators,        )
                                              )   Case No.1:08-cv-1244-TSE-TRJ
v.                                            )
                                              )
USTC                                          )
                              Defendants.      )
_____       )

*RELATORS' MOTION AND MEMORANDUM OF LAW*
*IN SUPPORT OF THEIR EMERGENCY MOTION FOR CLARIFICATION OR, IN THE*
*ALTERNATIVE, BIFURCATION OF DAMAGES ADJUDICATION*

Relators respectfully request that the Court clarify its rulings on damages.  Taken

collectively, the Court's rulings seem to have barred the Relators from introducing its two

damages estimates showing that, if the jury finds intent to defraud, the United States was

overbilled for labor and travel by more than 123 million dollars.    If that is an accurate

understanding, the Court's rulings stripping Relators of their ability to share damage estimates

with the jury are fundamentally unfair, and not required by the law, as is explained below in

Argument.

I.       BACKGROUND FACTS

Relators prepared and submitted two damages computations that are estimates of the

amount the United States was overbilled:  travel  ($10.2 million) and labor ($113.2 million).

The following sets forth the chronology of events:

On April 20, 2011, Relators produced to Defendants a supplemental expert report that

included Mr. Wills' damage computation the travel issue.  *See* Relators' Exhibit 349 at Ex. A-1

and A-2 (copy appended).[1]  This production met the deadline imposed by the Magistrate Judge. This damage estimate computes damages based on the costs billed by Defendant to the United States by way of submission of DAKKAK invoices.

On May 26, 2011, defense counsel deposed Mr. Wills.  He introduced the April 20, 2011, report as an exhibit, and elicited testimony from Mr. Wills about what type of data he would need to look at to determine how much Blackwater actually paid for travel.  Mr. Wills testified that he would need Blackwater accounting data.  If he had that data, he (and any other accountant) would be able to trace the payments through the records, and conclude with certainty whether the United States had been charged what Blackwater had actually paid.  *See* Wills Tr. at 84 – 90 ("And ultimately it has to go down to specific travel occurrences.  You can't say:  Give me $10,000 worth of travel.  There has to be, when you're dealing with a travel agency, I'm buying specific trips for specific people.  So tell me who the specific trips were for, who the people were, and how much [cost] is associated with trips to enable the comparison to the person-specific travel events that were billed to the Department of State.")( copy appended).

The *only* data in the record showing the amount that Defendant paid to DAKKAK Travel agency is *aggregated* data.  Defendant produced American Express statements that show substantial lump sums paid to DAKKAK – *e.g.* an entry stating DAKKAK and showing lump sum payment of $43,370.74 on May 31, 2006.  *See* Relators' Exhibit No. 50 (copy appended). But simply totaling up those lump sums is meaningless, because Defendant used DAKKAK to transport personnel on all contracts, not merely WPPS II .  As the Court has noted in other contexts, Defendant had many government contracts.  Thus, without a DAKKAK invoice billing

---

[1] Relators are providing copies of the referenced trial exhibits to the Court because the parties do not submit their exhibits and objections thereto until Monday, July 25, 2011.  Relators will append those records to the public version and refile on Monday, July 25 or as soon thereafter as the trial exhibits come out from under seal.

Defendant for particular travel for particular people, it is impossible to recreate what Defendant paid to DAKKAK to transport the WPPS II personnel.  It may be that Defendant's accounting records have payment records with that level of detail, but Defendant – for reasons unknown to Relators – has refused to produce any existing travel records.

Nor did Defendant seek summary judgment using such records, which clearly they could have done if the accounting records prove no overcharging.  (Relators moved to compel production of these records for the very reason that the amounts actually expended on travel for WPPPS II personnel ***should be*** subtracted from the damages estimate.)   Relators' expert Mr. Wills views the failure to produce accounting records as dispositive on this point, and did not consider non-person-specific averages drawn from publicly-available information.  As Relators' counsel told the Court yesterday, however, Relators do not object if Defendant wants to put together such data, and argue from it that "well, the company must have paid something because we know they got there."[2]

Second, on July 13, 2011, Defendants received a computation that estimated labor overbillings.[3]  This computation arrived at a damages estimate of $113,269,525 based on extrapolating from an analysis of a randomly-selected subset of 308 labor man day billings found on the musters, and comparing those to the only available time-and-attendance records known as PERTATS.  That computation resulted in an error rate of 16.76 percent.   Relators are appending the statistical summary as Exhibit A (which was not marked as a trial exhibit in the light of the Court's ruling).  The analysis of actual records is appended as Relators' Exhibit 369 (copy appended).

---

[2] Relators respectfully reserve the right, to argue to the jury that using such data creates more questions than it answers because the company should have actual records to show what it paid.
[3] Although sent on July 8, it was not received until July 13 for reasons of record.

Stated different, this analysis reveals there is either *no* PERSTAT or a ***conflicting*** PERSTAT for 16.76 percent of Defendants' labor billings.   The charts produced to Defendants are appended as Exhibit B (and put under seal because they include names).  This chart shows that amount billed was $281,708 but the amount supported by PERSTATS is only $234,497.  It is easy for anyone to calculate from that chart that the actual damages from those particular 308 man days is $49,211.  (When the Court asked if the Relators' production included a computation, counsel answered no because the chart does not actually do the computation, but it is easily done from what was provided via email on July 8.)   Defense counsel are deposing Mr. Wills today about the work product.

## ARGUMENT

The Court barred Relators from introducing the $113 million labor damages estimate on the grounds that the evidence was untimely.  *See* Dkt. 553. As Relators' counsel understands the Court rulings yesterday, the Court barred Relators' counsel from introducing the $10.2 million estimate of travels on the grounds that it did not subtract from  the estimate the amounts that Defendants actually paid for the travel in question.   *See* Transcript of July 21, 2011, Hearing.

Judicially-imposed deadlines are critical to the prompt resolution of disputes.  All that Relators are asking is that the judicially-imposed deadlines be enforced as to ***both*** parties, with the resulting attendant consequences falling on both parties, not merely Relators.  The deadlines in federal litigation are set sequentially to permit an orderly process.  Expert reports typically are at the end of that process for obvious reasons; they rely on the information produced pursuant to deadlines set for that earlier portion of the process.

Here, if the Court acts even-handedly and holds ***both*** parties to the deadlines set by Magistrate Jones, the result is significant.

4

The close of discovery was April 29, 2011.  By that date, and *even to present*, Defendant has not produced any PERSTATS for Task Order No. 4 and 8.  Defendant made no proffer to the Court on why it has not produced those time-and-attendance records (PERSTATS).  By April 29, 2011, on Task Order No. 6, Defendant had produced certain PERSTATS – namely, the universe of PERSTATS that had been produced to the OIG (Cotton).

 If the jury finds that the company knowingly (which includes recklessly or in deliberate ignorance) made false claims, the jury should be able to use the Defendant's own documents reflecting revenue earned on those task orders, use the testimony they heard at trial, and reach their own judgment, unguided by any computation from Relators, to assess a damages figure. *See* Relators' Exhibit No. 129 (copy appended).

 By the discovery close, on Task Order No. 6, Defendant had produced the same PERSTATS that had been produced to the OIG (Cotton).  If the Court holds Defendant to the deadline, and bars the use of any PERSTATS produced after that date, Relators should be able under the decisional law to use the OIG audit done by Cotton as an estimate to show the jury damages on Task Order No.6.  That is, Defendants produced by the discovery deadline only those PERSTATS already reviewed by the OIG.   The OIG estimated that Defendant lacked any support for $333,219,103 million in labor billings.  *See* Relators' Ex. 272 (copy appended).

 It may be that Court fears the jury will not properly take into account the demonstrable fact that Defendant  provided a substantial amount of services, and also spent a substantial amount of money on travel.  But Defendant is in control of which records they produce and which they hold back.  Defendant set up its labor billing system and cost reimbursement system. If those systems are unable to generate any records that disprove allegations of fraud, that does not mean Defendant should go unpunished if it did, in fact, commit fraud.   Relators are ***not***

suggesting that the company be found to have committed fraud **merely** because of the way it set

up its records.  But if the company committed fraud (as proven by testimony of those involved in

the commission of the fraud), and also obscured detection of that fraud by the way it kept or

failed to keep records, the law provides a remedy.

As the Supreme Court held in *Story Parchment Co. v. Paterson Parchment Paper Co*.,

282 U.S. 555 (1931), there are many wrongs that create damages that are uncertain in amount.

But that is not a reason to let those wrongs go unredressed:  "It is true that there was uncertainty

as to the extent of damage, but there was none as to the fact of damage; and there is a clear

distinctions between the measure of proof necessary to establish the fact that petitioner had

sustained some damage and the measure of proof necessary to enable the jury to fix the amount.

The rule which precludes recover of uncertain damages applies to such as are not the certain

result of the wrong, not to those damages which are definitely attributable to the wrong and only

uncertain in respect of their amount."

The Court explained that a wrongdoer should not evade accountability merely because

the misconduct is hard – or indeed impossible – to quantify.  "In such case, while the damages

may not be determined by mere speculation or guess, it will be enough if the evidence show the

extent of the damages as a matter of just and reasonable inference, although the result be only

approximate.  Thewrongdoer is not entitled to complain that they cannot be measured with the

exactness and precision that would be possible if the case, *which he alone is responsible for

making*, were otherwise."  *Id*.

The Court explained "And when, from the nature of the case, the amount of the damages

can not be estimated with certainty, or only a part of them can be so estimated, we can see no

objection to placing before the jury all the facts and circumstances of the case, having any

tendency to show damages, or their probably amount; so as to enable them to make the most intelligible and probable estimate which the nature of the case will permit."

The Fourth Circuit applied *Story* in the context of a securities fraud case to uphold a jury verdict that found liability but zero damages. *Miller v.Asensio & Company*, 364 F.3d 223 (4th Cir. 2004).   The Court explained in footnote 5 that the "The principle enunciated in *Story* – that a plaintiff's inability to prove damages with mathematical precision does not bar recovery – both allows presentation of somewhat "uncertain" damages calculations to the jury and insulates from vacatur the jury's "estimate" based on such calculations." *Id.* at 231, n.5.

The Supreme Court's holding in *Story* applies with equal – if not greater -- force to False Claims Act cases, which protect the public fisc.   Indeed, the very reason government contractors are required by law to maintain time-and-attendance records is to permit the government to replicate what they did in order to ensure that there is not overbilling for labor and costs.   *See*; *e.g. United State of America ex rel. Tyson v. Amerigroup*, 488 F. Supp. 2d 719 (N.D. Ill. 2007).

The Fourth Circuit held in *United States ex. rel Taxpayers Against Fraud v. Singer*, 889 F.2d 1327 (4th Cir. 1989) that in Truth in Negotiations Act cases, "the law provides  rebuttable presumption that the government is damaged dollar-for-dollar by the nondisclosed amount once nondisclosure is shown."  Although this False Claims Act case may be distinguished both procedurally (injunction stage) and substantively (TINA  case), the reasoning is instructive. *See also United States v. Rogan*, 517 F.3d 449, (7th Cir. 2008),  in which the Court (J. Easterbrook) explains "[t]he United States if entitled to guard the public fisc against schemes designed to take advantage of harried, or inattentive disbursing officers; the False Claims Act does this by insisting that person who send bills to the Treasury tell the truth." *See also United States ex rel. Killough, 848 F.2d 1523* , (11th Cir. 1988).

7

Relators again urge the Court to consider bifurcating damages, and holding a bench  trial if there is a finding of liability.  Otherwise, if the jury finds the Defendant intended to defraud the United States, it is not an appropriate use of judicial resources to obtain for the public fisc only a small fraction of the damages that likely resulted from that fraud.   There is ample precedent for such an approach.   Indeed, if the jury finds that Defendant's conduct rises to the False Claims Act level of "recklessness" and imposes liability for recklessly billing for labor on WPPS II, it would be nonsensical to return to the public fisc only an amount based on actual damages of $49,211.  Defendant obtained over one billion dollars for labor charges, an appeal would inevitably follow because such an end result would encourage other defense contractors to stop keeping *any* time-and-attendance records, as the benefits from refusing to do so would far outweigh the costs, as least in this District.  This Court should not permit such a miscarriage of justice to occur.

Relators believe an evidentiary hearing on damages held by the Court after a jury verdict on liability would prevent this result, and prevent the further consumption of public resources. Holding such an evidentiary hearing is well within the Court's powers.

Respectfully submitted,


**/s/Susan L. Burke_____**
Susan L. Burke (Va. Bar No. 27769)
sburke@burkepllc.com
Susan M. Sajadi
ssajadi@burkepllc.com
BURKE PLLC
1000 Potomac Street NW, Suite 150
Washington, DC 20007
Telephone: (202) 386-9622
Facsimile: (202) 232-5513
*Counsel for Relators*

Joseph F. Rice

MOTLEY RICE LLC
28 Bridgeside Blvd.
Dated:  July 22, 2011                    Mt. Pleasant, SC 29464

## CERTIFICATE OF SERVICE

I hereby certify that on the 22th day of July 2011, we filed the foregoing Motion for

Clarification and Memorandum in Support using the CM/ECF system, which will send a

notification to counsel for Defendants and counsel for the United States.


/s/Susan L. Burke_____
Susan L. Burke